Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

Meriel L. Darzen (OSB #113645)
Crag Law Center
3141 E. Burnside Street
Portland, Oregon 97214
Tel: 503-525-2725
Email: meriel@crag.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES FOREST SERVICE, a federal agency, <br><br> Defendant. | Civ. Case No. <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br> (Violations of National Environmental Policy Act, Endangered Species Act, Freedom of Information Act, and Administrative Procedure Act) |

## INTRODUCTION

1.     Cascadia Wildlands and Oregon Wild ("Plaintiffs") bring this civil action for

declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§

701–706, for claims arising under the laws of the United States, including the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA"), regarding the unlawful actions of the United States Forest Service ("Forest Service" or "Defendant").

2.     In 2020, fires burned through various Forest Service timber sale project areas throughout the Willamette National Forest. These fires burned at a variety of severities, and affected parts of the forest that were slated for previously approved but unimplemented timber sales. These areas included parts of two unimplemented projects that Plaintiffs participated in developing: the Green Mountain Project and the Lang Dam Project.

3.     The Green Mountain Project was in large part designed to mimic the effects of fire on the landscape and involved logging of live green trees. The Forest Service reasoned that because "[p]ast logging practices and fire exclusion have resulted in dense, uniform species stands," commercial logging was designed to mitigate these negative impacts by mimicking "natural disturbance patterns" and restore these stands by thinning and adding more snags and downed wood. Additionally, the project was designed to create "early seral habitat," or post-fire habitat, because it was lacking on the landscape.

4.     The Forest Service signed a final record of decision for the Green Mountain project in 2017.

5.     The Lang Dam project was designed to use commercial thinning to restore forest stands that had high tree-density, only moderate amounts of downed wood, and few snags. Again, the logging prescriptions targeted live trees and were designed to mimic the effects of a mixed severity fire that would result in natural mortality and density reduction while creating a substantial amount of downed wood and snags.

6.      Both projects affected resident endangered species and required ESA Section 7 consultation.

7.      At the time fires burned through these areas in 2020, portions of these two projects remained unimplemented.

8.      The 2020 fires drastically changed the Green Mountain and Lang Dam project areas. The fires reduced tree density and created snags and downed wood.

9.      Across the project area, the fires created substantial amount of complex early-seral habitat.

10.     In other words, the fires naturally created much of the habitat conditions the Forest Service's Green Mountain and Lang Dam projects were designed to mimic.

11.     After the fires were contained, the Forest Service "repackaged" several timber sales from the Green Mountain and Lang Dam projects and changed the logging prescriptions from restoration thinning to post-fire clearcutting and salvage logging.

12.     These changes were made without any public process, NEPA analysis, or ESA consultation. Plaintiffs happened to discover that the logging was occurring and connected the dots to the previous projects.

13.     In the wake of this discovery, Plaintiffs requested records pertaining to the changes from the Forest Service.

14.     The Forest Service did not provide the requested documents and stopped responding to Plaintiffs' email inquiries.

15.     The Forest Service removed the documents and project files associated with the Green Mountain and Lang Dam timber sales from the Forest Service website.

16.     On June 7, 2021, Cascadia Wildlands submitted a Freedom of Information Act ("FOIA") request for records pertaining to the project changes. This request was acknowledged by the Forest Service, but the agency has yet to produce any documents.

17.     The post-fire logging on the Lang Dam and Green Mountain projects must be analyzed under NEPA. The ongoing post-fire logging has impacts on the human and natural environment that have not been considered in any existing NEPA document. Further, the post-fire landscape in which this logging is currently taking place has never been analyzed by the Forest Service in any NEPA document.

18.     The 2020 fires and the changes from green tree prescriptions to post-fire salvage amount to significant new information and changed circumstances that require supplementation of Green Mountain and Long Dam NEPA documents and reinitiation of ESA consultation.

19.     Plaintiffs seek declaratory and injunctive relief to redress the injuries caused by these violations of laws and prevent the irreparable degradation of these post-fire complex seral habitats which the Forest Service previously claimed were needed in the Green Mountain and Long Dam project areas.

20.     Further, Defendant has violated FOIA by failing to provide any responsive documents to Cascadia Wildlands' request for records relating to the project changes in the wake of the 2020 fires. The Forest Service acknowledged the request, but to date has failed to provide any responsive documents or definitely state when it might do so. Accordingly, the Forest Service is unlawfully withholding the records by failing to search for and provide all responsive records as required by FOIA.

21.     By initiating this action, Plaintiff seeks to: 1) obtain a declaration that post-fire modification of these existing projects violates NEPA; 2) obtain a declaration that Defendant's failure to reinitiate Section 7 consultation violates the ESA; 3) obtain a declaration that

Defendants' failure to timely make determinations on the FOIA request is unlawful under FOIA, 5 U.S.C. § 552(a)(6)(A); 4) order the Forest Service to search for and produce all responsive records to the FOIA request sought in this action by a reasonable date certain; and 5) enjoin the Forest Service, its contractors, assigns, and other agents from moving forward with any further activity within these project areas unless and until this court determines that the violations of law set forth herein have been corrected.

## JURISDICTION AND VENUE

22.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq*., the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*., Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(B), and the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.* An actual, justiciable controversy exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. § 1651, 28 U.S.C. §§ 2201-02, and 5 U.S.C. §§ 701-06.

23.    Venue in this court is proper under 26 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs and Defendant reside in this district, and the public lands and resources at issue are located in this district. Plaintiffs Cascadia Wildlands and Oregon Wild have offices in Eugene, Oregon. Pursuant to Local Rule 3-2(b), this case is properly filed in the Court's Eugene Division in Eugene, Oregon.

## PARTIES

24.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United

States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore

wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska.

Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in

the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia

Bioregion. Cascadia Wildlands' members have used and will continue to use the Lang Dam and

Green Mountain Project area for activities such as hiking, bird watching, camping, swimming,

fishing, foraging, photography, and other recreational and professional pursuits.

25.    Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000

members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild

and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as

an enduring legacy.  Oregon Wild members use the North Fork Overlook area for hiking,

recreation, bird watching, nature appreciation, and other recreational pursuits.  The interests of

Oregon Wild and its members will be irreparably impaired if the North Fork Overlook sale is

allowed to proceed without compliance with our federal environmental laws.

26.    Defendant UNITED STATES FOREST SERVICE is an agency or

instrumentality of the United States and is charged with managing the public lands and resources

of the Willamette National Forest in accordance and compliance with federal laws and

regulations.

## APPLICABLE LAW

### National Environmental Policy Act  (NEPA)

27.    Congress enacted NEPA in 1969, directing all federal agencies to assess the

environmental impacts of proposed actions that "significantly affect the quality of the human

environment." 42 U.S.C. § 4332(2)(C).

28.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA and elaborating on the requirements of an EIS. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's 1978 NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020. 40 C.F.R. §§ 1500–1508 (2020).

29.     On his first day of office, President Biden issued Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis. The policy statement of EO 13990 provides that the policy of the Biden Administration is to, *inter alia*, listen to the science and to improve public health and protect our environment. EO 13990 directs the heads of all agencies to immediately review all existing regulations, orders, guidance documents, policies, and any similar agency actions promulgated, issued, or adopted between January 20, 2017, and January 20, 2021 that are inconsistent with the policy statement.

30.     The Biden Administration provided a non-exclusive list of agency actions that the heads of relevant agencies will review in accordance with EO 13990. The modification to the CEQ regulations is on the list.

31.     The heads of some executive agencies and departments already have taken action pursuant to EO 13990. *See, e.g.*, Secretary of the Interior Order ("SO") No. 3399: Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process. SO 3399 provides that "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020." A similar directive applicable to the Forest Service/U.S. Department of Agriculture may be forthcoming.

32.    NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action and (2) to ensure that the public has sufficient information to meaningfully participate in the decision-making process.

33.    NEPA's first requirement that federal agencies prepare an Environmental Impact Statement (EIS) "serves NEPA's 'action-forcing' purpose" of "ensur[ing]" that federal decisionmakers "will have available, and will carefully consider, detailed information concerning significant environmental impacts" before approving new projects.

34.    An EIS is a "detailed statement" that must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

35.    When it is not clear whether an action requires the preparation of an EIS, the regulations direct agencies to prepare a document known as an Environmental Assessment ("EA") in order to determine whether an EIS is required. 40 C.F.R. §§ 1501.5(b), 1508.1(h) (2020).

36.    If based on an EA, an agency determines that an action may have a significant environmental impact, the agency must prepare an EIS. 40 C.F.R. § 1501.3 (2020). If the agency determines that the impacts will not be significant, the agency must prepare a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.6 (2020).

37.     NEPA's second requirement promotes transparency, ensuring that environmental information is available to public officials and citizens before agencies make final decisions or any actions occur to implement proposed projects.  40 C.F.R. § 1500.1 (2020).

38.     Even after an agency has completed an EIS or an EA, NEPA requires it to prepare a new or supplemental analysis where significant new information relevant to environmental concerns and bearing on the proposed action or its impacts arises, or where the agency makes substantial changes to the proposed action that are relevant to environmental concerns. This mandate is present in both the 1978 CEQ regulations as well as the 2020 CEQ regulations. *See* 40 C.F.R. § 1502.9(c)(1) (2019); 40 C.F.R. § 1502.9(d)(1) (2020).

### Freedom of Information Act (FOIA)

39.     FOIA's basic purpose is government transparency. It establishes the public's right to access all federal agency records unless such records may be withheld pursuant to one of nine, narrowly construed FOIA exemptions. 5 U.S.C. § 552(b)(1)-(9).

40.     FOIA imposes strict and rigorous deadlines on federal agencies when they receive a request for records pursuant to FOIA. Specifically, an agency must determine whether to disclose responsive records and notify the requester of its determination within 20 working days of receiving a FOIA request, and it must make records "promptly" available, unless it can establish that certain unusual circumstances are present and/or that it may lawfully withhold records, or portions thereof, from disclosure. 5 U.S.C.§ 552(a)(3)(A), (a)(6).

41.     Also within 20 working days, the agency must inform the requester that it has a right to appeal the agency's determination. *Id.* § 552(a)(6)(A)(i).

42.     FOIA places the burden on the agency to prove that it may withhold responsive records from a requester. 5 U.S.C.§ 552(a)(4)(B).

43.    Congress has specified limited circumstances in which federal agencies may obtain more time to make the determination that is required by 5 U.S.C. § 552(a)(6)(A)(i).

44.    First, an agency may toll the 20-working-day deadline to seek additional information or clarification from a requester, but that tolling period ends when the agency receives such information or clarification. 5 U.S.C.§ 552(a)(6)(A).

45.    Second, an agency may extend the 20-working-day deadline for an additional 10 working days by giving a written notice to the requester that sets forth "unusual circumstances" to justify a deadline extension, which also requires that it provide the date by which the agency expects to make the determination. 5 U.S.C.§ 552(a)(6)(B)(i). However, to invoke such "unusual circumstances," the agency must provide the requester with "an opportunity to limit the scope of the request so that it may be processed within [20 working days] or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request." *Id.* § 552(a)(6)(B)(ii). In addition, when asserting unusual circumstances, the agency "shall make available its FOIA Public Liaison" to "assist in the resolution of any disputes between the requester and the agency." *Id.*

46.    FOIA requires each agency to make reasonable efforts to search for records in a manner that is reasonably calculated to locate all records that are responsive to the FOIA request. 5 U.S.C.§ 552(a)(3)(C)-(D).

47.    FOIA requires federal agencies to expeditiously disclose requested records, 5 U.S.C.§ 552, and mandates a policy of broad disclosure of government records. Any inquiry under FOIA brings with it a strong presumption in favor of disclosure.

48.     The United States district courts have jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C.§ 552(a)(4)(B).

49.     Alternatively, an agency's response to a FOIA request is subject to judicial review under the APA, which confers a right of judicial review on any person who is adversely affected by an agency action, 5 U.S.C. § 702, and authorizes district courts to compel agency action that is unlawfully withheld or unreasonably delayed. *Id.* § 706(1). District courts must set aside any agency action that is found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* § 706(2)(A).

## **Endangered Species Act (ESA)**

50.     Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

51.     To achieve this purpose, the Secretaries of Commerce and the Interior are responsible for administering and enforcing the ESA. *See* 16 U.S.C. § 1532(15).

52.     The Secretaries of Commerce and the Interior delegated this responsibility to the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("FWS"), respectively (collectively, the "wildlife agencies"). 50 C.F.R. § 402.02(b).

53.     "Endangered Species" is defined as any species which is in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6).

54.     In addition to the responsibilities of the Secretaries, all federal departments must seek to conserve threatened and endangered species. 16 U.S.C. § 1531(c)(1). Section 7 of the ESA establishes that federal agencies have a substantive obligation to "insure that any action

authorized, funded, or carried out by such agency...is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species...determined...to be critical...." 16 U.S.C. § 1536(a)(2).

55.    To meet this substantive duty, Section 7 imposes procedural requirements on federal agencies. In particular, federal agencies must engage in consultation ("Section 7 Consultation") with either or both wildlife agencies before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2).

56.    A federal agency must comply with the procedural requirements of Section 7 Consultation for endangered species. 16 U.S.C. § 1536. For Section 7 consultation, a federal agency must determine whether a proposed action may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

57.    Both the action agency and the wildlife agency must ensure that an action is "not likely to jeopardize the continued existence of any [listed] species or resulting in the destruction or adverse modification of [critical habitat]. 16 U.S.C. § 1536(a)(2).

58.    Federal agencies must use the best scientific and commercial data available to comply with their obligations under Section 7. 16 U.S.C. § 1536(a)(2).

59.    Reinitiation of Section 7 consultation is required where discretionary Federal involvement or control is retained or authorized by law, and if, either new information reveals effects on a listed species or critical habitat not previously considered, or if the original action is modified in a manner that causes an affect not previously considered. 50 C.F.R. § 402.16(a)(2), (3).

60.    The duty to reinitiate consultation lies with both the action agency and the wildlife agency.  *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).

### Administrative Procedure Act

61.    The Administrative Procedure Act (APA) confers a right of judicial review on any person adversely affected by federal agency action.  5 U.S.C. § 702.  Upon review, the court shall "hold unlawful and set aside agency actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

### STATEMENT OF FACTS

### Holiday Farm Fire

62.    The 2020 wildfire season drastically affected the Willamette National Forest. The Holiday Farm Fire began on September 7, 2020, encompassed 173,439 acres of primarily mixed conifer forest, burned in a mosaic pattern through most of the area, and the majority burned with low and moderate severity.

63.    On September 30, 2020, the Forest Service assembled a Burned Area Emergency Response team, composed of specialists in soils, geology, hydrology, engineering, botany, recreation, archaeology, fisheries, and GIS to begin assessing the post-fire effects to critical values on Forest Service lands.

64.    Given the mosaic burn pattern of the Holiday Farm Fire, the mixed-conifer landscape throughout the burn area was affected in a variety of ways.

65.    In areas where the fire burned at moderate to high severity, the fire created complex early seral stands, which the Forest Service has previously determined was lacking across the landscape given past and ongoing fire suppression practices.

66.     The fires also created downed wood and snags, or standing dead trees, or damaged trees that will die over the next 10-20 years and provide critical habitat for older forest species.

67.     The fire also impacted soils. Soil burn severity (SBS) is the primary characteristic driving post-fire soil erosion response and sediment delivery.

68.     Within the Holiday Farm Fire burned area, 63% of mapped areas on Forest Service managed lands experienced high and moderate SBS. Across this area, long-term soil productivity was identified as a critical value with a high risk of damage or loss.

69.     Concerning geology and landslide risk, the Forest Service concluded that "there is an elevated risk of instability in the form of rockfall and debris flows across much of the burned area." The Forest Service concluded that "[t]he cumulative risk of various types of slope instability, sediment bulking, and channel flushing is high along many slopes and drainages in and below the burned area following the Holiday Farm Fire."

70.     Concerning hydrology, the Forest Service concluded that the "[p]rimary watershed response is expected to include an initial flush of ash and burned materials, erosion in drainages and on steep slopes in the burned area, increased peak flows and sediment transport and deposition, and debris flows. These responses will likely lead to increased water quality concerns for municipal and domestic drinking water providers within and downstream of the fire."

71.     Concerning wildlife, the Holiday Farm Fire occurred within the range of northern spotted owl (NSO), a species that is listed as threatened under the Endangered Species Act.

72.    In designated critical habitat for the NSO, 1,684 acres burned with high severity, totaling 12% of the critical habitat in the fire area) and 10,740 acres burned with moderate severity totaling 77% of the critical habitat in the fire area).

73.    Threats include additional loss of habitat in the fire area due to blowdown, mass soil movement, flooding, and insects and disease. Each of these threats could result in additional mortality to remaining live trees and further reduce NSO suitable habitat and usable critical habitat and threaten the viability of nesting territories."

74.    "Streams and rivers affected by the Holiday Farm Fire support runs of federally listed Upper Willamette spring Chinook salmon (threatened), Upper Willamette steelhead trout (threatened), and bull trout (threatened)."

75.    Critical habitat for these species occurs across the fire-impacted region. Potential post-fire effects in select tributaries of the McKenzie River, Middle Fork Willamette River, and Upper Willamette River include: increase in peak flows laden with debris potentially leading to increase in accelerated channel scour and hillslope erosional processes, increase in fine sediment leading to direct mortality of eggs and fry and decrease of habitat elements such as pools, and increase in the likelihood of other negative effects to habitat from increased flow interaction with infrastructure."

76.    Post-fire logging has occurred in, and is proposed for, areas affected by the Holiday Farm Fire.

77.    The Willamette National Forest has approved a roadside commercial logging project that will log approximately 20,000 acres.

78.    Additional adjacent post-fire logging is being implemented by the Bureau of Land Management, private forest managers, and the Oregon Department of Transportation.

## Green Mountain Project

79.     The Green Mountain project area consists of approximately 99,051 acres along the South Fork McKenzie River within the McKenzie River Ranger District.

80.     The Green Mountain project (as originally approved) would have treated 4,364 acres including 1,458 acres of commercial thinning and 901 acres of commercial thinning along waterways. It also included 262 acres of regeneration harvest and 333 acres of gaps (complete tree removal), and 288 acres of dominant tree release. It also included 10.2 miles of new temporary road construction.

81.     The project had three purposes: (1) provide a sustainable supply of timber, (2) increase habitat complexity, and (3) shift age class and structural diversity.

82.     The Forest Service concluded that logging was needed within the Green Mountain project area because "[p]ast logging practices and fire exclusion have resulted in dense, uniform species stands."

83.     The Green Mountain project was designed to shift the age class of existing forests or create forests that are 0-15 years in age through large scale regeneration harvest, which would create "early seral habitat," or post-fire habitat, because it was lacking on the landscape.

84.     The Forest Service determined that at any given point in time 5-20 percent of the landscape should be early seral habitat and that only .1 percent of the Green Mountain Project Area was early seral habitat. The proposed logging would have increased this percentage to 7 percent and thus help return the area within its natural range of variability.

85.     The Green Mountain project decision also approved 901 acres of logging along waterways in the project area.

86. The project would have affected Upper Willamette River Spring Chinook Salmon and Bull Trout, both species listed as threatened under the Endangered Species Act.

87. Specifically, the project as approved was likely to adversely impact Chinook salmon and bull trout and will adversely impact both species' designated critical habitats.

88. The Forest Service consulted with both NFMS and FWS regarding impacts to listed species. NMFS required nonnegotiable terms and conditions for the Project, including strict erosion and sediment control.

89. The FWS further recommended ongoing bull trout population monitoring to ensure occupancy.

90. The Green Mountain Project also negatively impacts the northern spotted owl and designated critical habitat for the northern spotted owl.

91. The Forest Service also consulted with FWS regarding effects of the project, as proposed, to northern spotted owl.

92. FWS determined that the proposed logging was "likely to adversely affect" northern spotted owl and "likely to adversely affect" its designated critical habitat.

93. FWS issued a Biological Opinion for the Green Mountain project in 2012 and the project was granted an incidental take permit for up to two owl sites. *Id.* at 25.

94. The Green Mountain Project included Project Design Features (PDFs), that were developed to reduce the environmental effects of the proposed activities and to ensure that the agency would implement project activities to comply with standards and guidelines, goals, objectives, conservation strategies, and Best Management Practices.

95. The Green Mountain PDFs were also intended to reduce the known harms that the Green Mountain Project would inevitably have on the species that inhabit it.

96.    Plaintiffs participated extensively in the administrative process that accompanied the Green Mountain Project.

97.    Cascadia Wildlands and Oregon Wild filed formal administrative objections to the project.

98.    The objections were resolved because the Forest Service changed the harvest prescriptions from regeneration harvest to thinning.

### Lang Dam Project

99.    The Lang Dam project area includes multiple subwatersheds of the McKenzie River and the South Fork McKenzie River and areas near the Cougar Reservoir.

100.    The project area is primarily used by hikers, hunters, anglers and bikers where enjoying scenery is often an integral part of the experience for these visitors. Trails in the project area are predominantly used by mountain bikers and hikers during the summer months and are used by hunters during hunting season. Mountain biking is a burgeoning use type and has been recently further supported by improvements to the O'Leary, Castle-Rock, King-Castle biking loop. Anglers and boaters enjoy sections of the lower South Fork McKenzie River which is designated as a Wild and Scenic Study River and where recreational boating and fishing are popular. Recreational driving and sightseeing occurs along sections of the West Cascade National Scenic Byway that passes through the project area and views of portions of the project area are possible from a developed overlook atop Cougar Reservoir Dam.

101.    The project would have conducted commercial harvest across 630 acres of 40 to 120-year-old forest stands.

102.    The decision also approved 331 acres of commercial thinning, 120 acres of riparian reserve thinning, 39 acres of gap creation, and 25 acres of dominant tree release.

103.    Similar to the Green Mountain Project, the Forest Service determined that these dense stands could benefit from thinning to remove density, increase growing space, and result in development towards larger diameter trees. The riparian logging was designed to "provide adequate stream shade, root strength, and bank stability, sediment filtration and nutrient cycling, large wood-supply to waterbodies and floodplains, organic matter input, and habitat for riparian-dependent wildlife."

104.    The Forest Service determined that the project would again impact chinook salmon and bull trout but would not "contribute to a loss of viability at the larger fifth-field watershed" and thus it was determined that project would not have significant impacts.

105.    The project would also negatively impact the northern spotted owl, but the Forest Service concluded it would not jeopardize its continued existence in the area.

106.    The Forest Service also concluded the project would not lower soil conditions below forest plan standards.

107.    Plaintiffs were involved extensively in the development of the Lang Dam project and participated in a field tour of the riparian logging units. Older logging units were dropped as result of citizen wildlife surveys conducted by Plaintiffs and its members.

108.    Oregon Wild and Benton Forest Coalition filed administrative objections to the project. *Id.* at 14.

**The Holiday Farm Fire's Effects on the**

**Green Mountain and Lang Dam Project Areas**

109.    The Holiday Farm Fire drastically affected the project areas of both Green Mountain and Lang Dam.

110.    The Green Mountain and Lang Dam Projects are not fully implemented.

111.    The fire changed stand compositions and structural complexity within the project areas and within unimplemented logging units.

112.    The fires reduced stand densities within the project area and within unimplemented logging units.

113.    The Forest Service has not addressed or analyzed the changed stand compositions in the Green Mountain and Lang Dam project areas resulting from the Holiday Farm Fire.

114.     The fire created early seral habitat within the project areas and the larger forest.

115.    There is no longer a need to create early seral habitat in the project areas because the fire created these conditions.

116.    Early seral habitat levels in the area now exceed plan standards.

117.    The fire created snags and downed wood and there is no longer a need to create snags or downed wood in the Green Mountain and Lang Dam project areas.

118.    The fires affected soil resources within the project areas and within unimplemented logging units.

119.    Logging operations within burned areas raise additional issues concerning impacts to soil resources. For example, logging operations within burned areas can have different effects on soil resources from logging operations in unburned areas.

120.    The fires affected protected species that also remain to be impacted by these projects.

121.    Concerning the northern spotted owl, while owls generally still utilize post-fire habitat, fires pose threats to the species, including additional loss of habitat in the fire area due to blowdown, mass soil movement, flooding, and insects and disease. Each of these threats could

result in additional mortality to remaining live trees and further reduce NSO suitable habitat and usable critical habitat and threaten the viability of nesting territories.

122.    In 2017, the Forest Service determined in analyzing the impacts of the Lang Dam project's commercial thinning that retaining 61 trees per acre or approximately 40 percent canopy cover would prevent the removal of spotted owl habitat, and thus avoid adverse species impacts or potential take of the species under the ESA.

123.    The documented current logging in the Lang Dam units did not include this retention.

124.    Similarly, the Green Mountain project included specific project modifications from its initial design to accommodate the northern spotted owl. The project thus included specific design features to protect spotted owl habitat features including direction to "retain existing snags where possible," and retain all existing large down woody material. If any snags were to be felled they were to be left on site.

125.    The Forest Service has not analyzed whether the current post-fire logging operations comply with prior guidance from the FWS concerning the spotted owl.

126.    The Forest Service has not analyzed whether the novel effects post-fire logging will have on spotted owls and the now altered spotted owl habitat.

127.    The Forest Service has not conducted spotted owl surveys to determine whether spotted owl sites within the Lang Dam and Green Mountain project areas are still occupied or have shifted following the fires.

128.    Concerning bull trout and upper Willamette River spring Chinook salmon, both the Lang Dam and Green Mountain project would have affected occupied habitat and designed Critical Habitat for the species.

129.    Although the fire may have caused immediate adverse impacts to this habitat from an increase in peak flows and fine sediment delivery, the fires also benefited these riparian habitats by greatly increasing large woody debris recruitment.

130.    Increases in large channel wood will have a long-term benefit on wood loading, geomorphic complexity, and habitat quality in Critical Habitat.

131.    Under the Northwest Forest Plan, logging in riparian areas is not permitted unless necessary to attain Aquatic Conservation Strategy ("ACS") Objectives. The Forest Service justified the riparian logging associated with the Green Mountain and Lang Dam projects because it determined that the proposed commercial thinning would create complex habitat structure representative of that which would result from natural disturbance patterns, create snags and downed wood, and open up the forest for more hardwoods to develop. Thus, the Forest Service was able to proceed with logging along waterways occupied by bull trout and upper Willamette River spring Chinook salmon because the logging was determined to be beneficial in the long term for these species.

132.    Post-fire salvage logging removes snags and downed wood that benefits riparian habitat.

133.    The Holiday Farm Fire naturally created complex early seral habitat in these riparian areas complete with space for hardwoods to develop, plentiful snags and downed wood, and room for surviving firs to develop into large shade providing conifers.

134.    Post-fire salvage logging is not necessary to achieve ACS objectives.

135.    The Forest Service has not analyzed whether post-fire logging within the riparian units of the Lang Dam and Green Mountain projects is necessary to achieve ACS objectives.

136.    Following the fires, in January of 2021 Plaintiffs reached out to the Forest Service to discuss post-fire logging operations.

137.    The Forest Service also confirmed that a few of the previously sold timber sales had been affected by the fires, including the Lang Dam project.

138.    The Forest Service stated that the Forest Service was working on "repackaging" these sales post-fire to allow them to move forward.

139.    In May of 2021, volunteer field-checkers and Plaintiff staff discovered a large, recently implemented clear-cut or regeneration harvest on the Willamette National Forest in an area that was burned by the Holiday Farm Fire. Concerned that this was illegal logging, Plaintiffs contacted the Forest Service.

140.    Darren Cross, the District Ranger for the Middle Fork Ranger District of the Willamette National Forest, responded via email "[t]here are several sales up the 19 road . . . associated with the Green Mountain EIS and Lang Dam EA."

141.     The email also confirmed that the specific post-fire logging discovered by Plaintiffs was part of the Lang Dam project.

142.    The Forest Service also confirmed that "[t]he prescription [for the Lang Dam units] was affected by the Holiday Farm Fire."

143.    The Forest Service then confirmed that up to seven different timber sales in this area of the forest were unimplemented or partially implemented, and that logging prescriptions might change from what were originally approved.

144.    The Forest Service changed logging prescriptions for timber sales authorized under the Lang Dam EA.

145.    The Forest Service changed logging prescriptions for timber sales authorized under the Green Mountain EIS.

146.    The Forest Service decreased tree retention levels within these logging prescriptions.

147.    The Forest Service changed the snag retention standards of the logging prescriptions.

148.    The changed logging prescriptions in the Green Mountain and Lang Dam project areas will affect protected resources differently than those logging prescriptions analyzed under the respective EA and EIS.

149.    These new post-fire logging prescriptions do not meet the purpose and need statements under the respective project EA and EIS.

150.    When deciding to change the logging prescriptions in the project areas, the Forest Service not consider the cumulative impacts of the completed, ongoing and planned post-fire logging in the project areas.

151.    The Forest Service did not analyze these new post-fire logging prescriptions and activities under a new NEPA document.

152.    Upon information and belief, the Forest Service did not supplement existing NEPA documents to address the changes to the project areas or the changes associated with modifying the proposed logging prescriptions.

153.    Upon information and belief, the Forest Service did not reinitiate consultation with FWS or NMFS concerning the impacts of the fire on listed species in the project area, or concerning the changed prescriptions in Green Mountain and Lang Dam timber sale units.

154.    In an effort to document and understand these project changes and the current cutting, Plaintiffs emailed Darren Cross and requested the timber sale contract modifications and associated records. Plaintiffs never received a response to this email.

155.    On May 27, 2021, Cascadia Wildlands submitted a FOIA request to the Forest Service for all records, information, documentation, and communication pertaining to the Lang Dam and Green Mountain timber sales since July 2020.

156.    The Forest Service responded to this request on June 7, 2021, acknowledging the request was received on June 1, 2021. The Forest Service also requested approval of a clarification to the request that was arranged via phone call earlier on June 7, 2021. Cascadia Wildlands approved the clarification via email on June 7, 2021.

157.    On June 30, 2021, Cascadia Wildlands emailed the Forest Service asking for an update on the request. The Forest Service responded via email and said "they are working on the request full tilt."

158.    On July 28, 2021, Cascadia Wildlands emailed the Forest Service again requesting any update on the request. The Forest Service responded that it had finished an initial review of documents and that it was "working quickly to release the initial batch of responsive documents as soon as possible. There will be additional documents released in a later batch once they're reviewed by our Regional Office for potential redactions."

159.    To date, Cascadia Wildlands has not received any formal response to its request or any records pertaining to the project changes.

### FIRST CLAIM FOR RELIEF:
### FAILURE TO SUPPLEMENT THE NEPA ANALYSES FOR THE GREEN MOUNTAIN AND LANG DAM PROJECTS

160.    Plaintiffs incorporate by reference all preceding paragraphs.

161.    The current CEQ regulations require that action agencies prepare a supplemental NEPA analysis when "major federal action" remains to occur and the initial NEPA document does not adequately discuss "significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2020).

162.    "An agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of its planned action, even after a proposal has received initial approval.'" *Friends of the Clearwater*, 222 F.3d at 557 (quoting Marsh 490 U.S. at 374); *Blue Mountains Biodiversity Project v. U.S. Forest Service,* 229 F.Supp.2d 1140, 1148 (D. Or. 2002).

163.    Major federal action remains to occur on both the Green Mountain and Lang Dam Projects.

*Count 1: The Failure to Supplement the NEPA Analyses for the Projects is Arbitrary and Capricious Because the Holiday Farm Fire created significant new circumstances and new information regarding the Green Mountain and Lang Dam Project Areas*

164.    Plaintiffs incorporate by reference all preceding paragraphs.

165.    The Holiday Farm Fire drastically transformed the Lang Dam and Green Mountain Projects areas.

166.    These forests are significantly altered, and the current logging of these areas involves different goals and effects.

167.    The Holiday Farm Fire constitutes significant new information that warrants the preparation of supplemental NEPA analyses for the Green Mountain and Lang Dam projects.

168.    Upon information and belief, the Forest Service has not analyzed the changes to the landscape pursuant to NEPA and its implementing regulations.

169.    The Forest Service's failure to prepare a new or supplemental analysis of environmental effects of the Green Mountain and Lang Dam projects as required by NEPA in light of the new information regarding the Holiday Farm Fire is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

*Count 2: The Failure to Supplement the NEPA Analysis for the Projects is Arbitrary and Capricious Because the Forest Service has made Substantial Changes to the Proposed Actions that are Relevant to Environmental Concerns*

170.    Plaintiffs incorporate by reference all preceding paragraphs.

171.    The Green Mountain and Lang Dam project decisions approved activities including thinning, regeneration harvest and replanting, dominant tree release, and skips and gaps, all to be implemented in areas with live trees unaffected by recent fire events.

172.    Upon information and belief, the Forest Service is implementing and/or intends to implement, via modified timber sale contracts, salvage and clearcut-type prescriptions in Green Mountain and Lang Dam timber sale units, which have been affected by the Holiday Farm Fire.

173.    For example, units which previously had prescriptions of thinning green live trees down to a density of 50 trees per acre have been salvage-logged, leaving few, if any, live trees.

174.    The change from a 50 trees per acre thinning prescription to a post-fire salvage prescription is a significant change to the proposed actions that will have different effects than what was analyzed in the original NEPA documents.

175.    Upon information and belief, the Forest Service is intending to further modify and implement these changed prescriptions in additional existing logging units in the area where the fire occurred.

176.    Upon information and belief, the Forest Service has not analyzed the effects of the changed prescriptions in the post-fire landscape pursuant to NEPA and its implementing regulations.

177.    Upon information and belief, the Forest Service is not implementing the PDFs for the Lang Dam and Green Mountain projects in the new or modified logging units.

178.    The Forest Service's failure to prepare a new or supplemental analysis of environmental effects for the Green Mountain and Lang Dam projects in light of the changes to the projects is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF (IN THE ALTERNATIVE): FAILURE TO ENGAGE IN NEPA ANALYSIS FOR NEW LOGGING ACTIVITIES IN THE HOLIDAY FARM FIRE

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires federal agencies to publish documents analyzing and documenting the environmental impacts, including direct, indirect, and cumulative impacts, of "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c).

181.    "Major federal action… means an activity or decision subject to Federal control and responsibility." 40 C.F.R. § 1508.1(q)(1) (2020). This may include "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.1(q)(2) (2020).

182.    A Forest Service commercial timber sale is a major federal action.

183.     The new post-fire logging projects and changed/new timber sale contracts within prior logging units associated with the Green Mountain and Lang Dam projects are major federal actions and necessitate the Forest Service's compliance with NEPA's analysis mandates.

184.     Defendants have not initiated or completed the required NEPA procedures.

185.     Defendants' failure to act and/or decision to violate the National Environmental Policy Act qualifies as agency action unlawfully withheld or unreasonably delayed" and/or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(1), (2)(A).

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF THE ENDANGERED SPECIES ACT

186.     Plaintiffs incorporates by reference all preceding paragraphs and allegations.

187.     The Biological Opinions for Northern Spotted Owl for the Green Mountain and Lang Dam projects were issued in 2012 and 2014 respectively. The Biological Opinions for Upper Willamette River Chinook Salmon and Bull Trout were completed in 2017.

188.     The Forest Service remains involved with the Green Mountain and Lang Dam projects and retains control over their implantation.

189.     The Holiday Farm Fire and the resulting changes to the landscape are new information that may affect listed species or critical habitat in a manner not previously considered in the prior Section 7 consultation processes, which only examined impacts of the Green Mountain and Lang Dam projects on listed species in an unburned landscape.

190.     The changed implementation of the Green Mountain and Lang Dam projects, including but not limited to the post-fire logging of previously identified green tree logging units from the two projects, may affect listed species or critical habitat in a manner or extent not previously considered in the biological opinions or written concurrences for those Projects.

191.    The Forest Service's failure to reinitiate Section 7 consultation violates the ESA and is arbitrary and capricious and not in accordance with law.

## FOURTH CLAIM FOR RELIEF:
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

192.    Plaintiffs incorporates by reference all preceding paragraphs and allegations.

193.    Pursuant to FOIA, the Forest Service "shall –[]determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after receipt of any such request whether to comply with such request and shall immediately notify the person making such a request of such determination and the reasons thereof . . . ." 5 U.S.C. § 552(a)(6)(A)(i). If the Forest Service can show "unusual circumstances" this deadline may be extended by no more than "ten working days." 5 U.S.C. § 552(a)(6)(B)(i). The deadline is tolled when the Forest Service makes a "request to the requester for information" until such information is provided by the requester. 5 U.S.C. § 552(a)(6)(A)(ii)(I)-(II). The Forest Service is also required to provide an estimated completion date for making a determination on a FOIA request, 5 U.S.C. § 552(a)(7)(B)(ii), and "shall make the records promptly available . . ." to the requester, 5 U.S.C. § 552(a)(3)(A).

194.    The Forest Service did not (and has yet to) make a determination regarding Cascadia Wildlands' June 1, 2021 FOIA request (2021-FS-R6-04164-F).

195.    Plaintiffs have exhausted administrative remedies.

196.    The Forest Service has admitted it has documents responsive to the request, but it has not provided these documents to Plaintiffs.

197.    The Forest Service has refused to provide an estimated completion date for the FOIA request and did not make records "promptly available" as required by FOIA.

198.    There is no legal basis for the Forest Service to assert that any of FOIA's nine disclosure exemptions apply.

199.    The Forest Service's failure to make a formal determination on the FOIA request outlined herein and related refusal to provide an estimated completion date and failure to make the records "promptly available" violates FOIA, 5 U.S.C. § 552(a).

**PLAINTIFFS' PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and issue the following relief:

1.    Declare that Defendant has violated NEPA and Defendant's violation of NEPA is agency action unlawfully withheld or unreasonably delayed" and/or is "arbitrary, capricious, or otherwise not in accordance with law," 5 U.S.C. §§ 706(1), (2)(A);

2.    Declare that Defendant has violated the ESA and Defendant's violation of the ESA is arbitrary, capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

3.    Enjoin the Defendant and their agents from carrying out any further implementation of commercial logging activities within the Green Mountain and Lang Dam project areas, until and unless the Forest Service prepares and circulates a supplemental or new NEPA analysis that evaluates the effects of its newly proposed post-fire logging and reinitiates and completes ESA consultation;

4.    Declare that Defendant has violated and continues to violate FOIA as alleged above;

5.    Direct Defendant to immediately make a determination on Plaintiffs' record request and provide Plaintiffs with the records requested by a date certain;

6.      Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements,

including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access

to Justice Act, 5 U.S.C. § 552(a)(4)(E) or other applicable statutes; and

7.      Grant such further relief as the Court deems just and equitable in order to provide

Plaintiffs with relief and protect the public interest.


DATED this 18th day of August, 2021.

_____
Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

Meriel L. Darzen (OSB #113645)
Crag Law Center
3141 E. Burnside Street
Portland, Oregon 97214
Tel: 503-525-2725
Email: meriel@crag.org


Attorneys for Plaintiffs

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to FRCP 7.1, Plaintiffs disclose that they do not have parent corporations, nor do the Plaintiff organizations have stock.