Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Email: nick@cascwild.org

Meriel L. Darzen (OSB # 113645)
Crag Law Center
3141 E. Burnside Street
Portland, Oregon 97214
Tel: 503-525-2725
Email: meriel@crag.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation, | Case No. 6:21-cv-01225-AA |
| Plaintiffs, | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| v. | |
| **UNITED STATES FOREST SERVICE**, a federal agency, | Oral Argument Requested<br>Expedited Consideration Requested |
| Defendant. | |

# MOTION

Comes now Plaintiffs Cascadia Wildlands and Oregon Wild ("Cascadia") and submits their *Motion for Preliminary Injunction* pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65. Cascadia respectfully asks this Court to grant preliminary relief enjoining the Forest Service from implementing modified contracts in burned areas until this Court has had an opportunity to resolve this matter on summary judgment.

Specifically, Cascadia asks this Court to enjoin implementation of the Lang Dam and Hwy 46 projects until the Forest Service completes additional environmental review. Logging in burned units has already occurred and unless emergency relief is granted, additional salvage logging activities may begin as soon as October 22—with more logging forthcoming.

Pursuant to Federal Rule of Civil Procedure 65(a)(1) and Local Rule 7-1(a)(1), the undersigned has conferred with counsel for Defendant. The Parties agreed upon a briefing schedule for resolution of this motion, and Defendant has agreed defer any logging until October 15, 2021 and give Plaintiffs 7 days notice prior to any ground-disturbing activity. *See* ECF10. However, the most recent conferrals between Plaintiffs' counsel and Defendant's counsel indicate that logging is likely to occur within the next few weeks. The area slated for imminent logging is a cherished area of the Willamette National Forest, near the Breitenbush Hotsprings Resort, campgrounds, entry to the Mt. Jefferson Wilderness, and other significant resources, all of which were already deeply affected by the 2020 Holiday Farm and Lionshead fires. Unless a Preliminary Injunction is granted, the Forest Service will continue implementing salvage prescriptions in burned areas without any further environmental analysis or public involvement or disclosure.

This case challenges the Forest Service's decisions to move forward with post-fire

MOTION FOR PRELIMINARY INJUNCTION—i

logging, including changing contracts from thinning to salvage logging, on areas that were part of previously approved projects. These projects, which include the Lang Dam and Hwy 46 projects, were forest restoration thinning projects that had been the subject of substantial public involvement and negotiations. Cascadia in particular worked extensively with the Forest Service, through comments, objections, objection resolutions, field trips, and post-objection meetings to reach agreement with the Forest Service on the implementation of these projects in a manner that would avoid litigation. Nonetheless, after the 2020 wildfires, which significantly affected the landscape within the project areas, the Forest Service, behind closed doors, changed the projects to allow for salvage logging in the burned units that neither considered in the original NEPA documents nor consistent with the agency's prior agreements with plaintiffs. These substantial changes to the projects required supplemental environmental analysis and public involvement particularly in light of the massive changes on the landscape from the fires and ongoing post-fire logging.

After first discovering the salvage logging in these former thinning units on April 29, 2021, Cascadia has diligently attempted to communicate with the Forest Service about its intent to salvage log without additional NEPA analysis. Their efforts were stymied at every turn, ultimately forcing this lawsuit, and this motion to seek emergency relief.

In support of this *Motion*, Cascadia respectfully refers this Court to the following *Memorandum in Support*, the declarations of Nick Cady, Bethany Cotton, Samantha Krop, Doug Heiken, and Dominic Della Salla filed herewith, together with the exhibits containing supporting materials attached to these filings. A Table of Exhibits is appended to the *Memorandum*.

MOTION FOR PRELIMINARY INJUNCTION—ii

<u>**MEMORANDUM IN SUPPORT**</u>

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................I

TABLE OF AUTHORITIES ......................................................**Error! Bookmark not defined.**

GLOSSARY OF TERMS ...........................................................**Error! Bookmark not defined.**

INTRODUCTION .......................................................................**Error! Bookmark not defined.**

BACKGROUND ....................................................................................................... 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW ...................................... 3

    <u>I.</u>    National Environmental Policy Act ................................................................... 3

    II.    Administrative Procedure Act............................................................................ 5

    III.    Preliminary Injunction ....................................**Error! Bookmark not defined.**

FACTUAL AND ADMINISTRATIVE BACKGROUND ..........**Error! Bookmark not defined.**

    I.    The 2020 Fires ................................................................................................. 6

    II. The Lang Dam Project………………………………………………………….9

    III. The Hwy 46 Project……………………………………………………………10

    IV. 2020 Fire Impacts to Lang Dam and Hwy 46……………………………………..12

ARGUMENT ........................................................................................................... 14

    I.    Cascadia Has Standing to Bring This Case...................................................... 14

    II.    Cascadia is Likely to Succeed on the Merits of its Claim that the Forest Service Violated NEPA by Failing to Supplement its NEPA Analysis................................... 16

        A.    The 2020 Fires resulted in significant changed circumstances.................................... 16

        B.    The Forest Service SIRs do not satisfy NEPA............................................................ 25

    III.    Cascadia Will Suffer Irreparable Harm Absent a Preliminary Injunction. .................. 31

    IV.    The Balance of Equities and Public Interest Tip Sharply in Cascadia's Favor. ........... 35

MEMORANDUM IN SUPPORT—I

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

V.  No Bond Should be Required…………………………………………………………35

CONCLUSION........................................................................................................ 35

TABLE OF EXHIBITS (CADY DECLARATION).................................................. 2

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................... 6, 32, 33, 34

*Amoco Prod. Co. v. Vill. Of Gambell*,
    480 U.S. 531 (1987) ......................................................................................... 31, 33

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ............................................................................... 21

*California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985) ............................................................................... 35

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ................................................................................ 22

*Cascadia Wildlands v. BLM*,
    Case No. 6:20-cv-01395-MK (D. Or. Sept. 13, 2021) ........................................ 17

*Cascadia Wildlands v. Scott Timber Co.*,
    190 F. Supp. 3d 1024 (D. Or. 2016) ..................................................................... 35

*Cent. Or. LandWatch v. Connaughton*,
    905 F. Supp. 2d 1192 (D. Or. 2012) ..................................................................... 35

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) ................................................................................ 31

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .......................................................................................... 5

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .............................................................................................. 4

*Environmental Protection Information Center v. Blackwell*,
    389 F. Supp. 2d 1174 (N.D. Cal. 2004) ................................................................ 34

*Envtl. Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) ..................................................................... 32, 33, 35

*Friends of the Clearwater v. Dombeck*,
    222 F.3d 552(9th Cir. 2000) ..................................................................... 5, 16, 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

528 U.S. 167 (2000) ............................................................................................... 15

*Gallatin Wildlife Ass'n v.USFS,*
    2016 WL 3282047 (D. Mont. June 14, 2016) ...................................................... 21

*Idaho Rivers United v. Probert,*
    No. 3:16-cv-00102-CWD, 2016 U.S. Dist. LEXIS 63767 (D. Idaho May 12, 2016) ........... 27

*Idaho Sporting Congress v. Alexander,*
    222 F.3d 562 (9th Cir. 2000) ................................................................. 17, 18, 21

*Jayne v. Sherman,*
    706 F.3d 994 (9th Cir. 2013) ........................................................................ 15

*League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ........................................................................ 35

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555, 560–61 (1992) ........................................................................ 15

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ............................................................................. 16, 25

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.* ("*State Farm*"),
    463 U.S. 29 (1983) .................................................................................. 5

*Northern Alaska Envtl. Ctr. v. Hodel,*
    803 F. 2d 466 (9th Cir. 1986) ...................................................................... 34

*Olympic Forest Coalition v. United States Forest Service,*
    556 F.Supp.2d 1198 (W.D. Wash. 2008) ........................................................ 18, 26

*Or Natural Res. Council Fund v. Goodman,*
     505 F.3d 884 (9th Cir. 2007) ...................................................................... 5

*Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.,*
    113 F.3d 1505 (9th Cir. 1997) ............................................................... 18, 25, 26

*Republic of the Philippines v. Marcos,*
    862 F.2d 1355 (9th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1035 (1989) ........................ 6

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ................................................................................. 4

*Russell Country Sportsmen v. U.S. Forest Serv.,*
    668 F.3d 1037 (9th Cir. 2011) ...................................................................... 22

MEMORANDUM IN SUPPORT—IV

*Sequoia Forestkeeper v. United States Forest Serv.*,
   No. CV F 07-1690 LJO DLB, 2008 U.S. Dist. LEXIS 115831 (E.D. Cal. Nov. 19, 2008) ... 23

*Sierra Club v. Bosworth*,
   465 F. Supp. 2d 931 (N.D. Cal. 2006) ........................................................................... 20, 25

*Sierra Club v. Bosworth*,
   Nos. C 05-00397 CRB, C 05-00898 CRB, C 04-02588 CRB, 2005 U.S. Dist. LEXIS 27573
   (N.D. Cal. Nov. 14, 2005) ......................................................................................... 27

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1989) ...................................................................................... 33

*Stand Up for California! v. U.S. Dep't of the Interior*,
   994 F.3d 616 (D.C. Cir. 2021) .................................................................................... 27

*Tongass Conservation Soc'y v. Cole*,
   No. 1:09-cv-00003 JWS, 2009 U.S. Dist. LEXIS 129952 (D. Alaska Dec. 7, 2009). 24, 29, 31

*Valle del Sol, Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) .................................................................................... 33

*W. Org. of Res. Council v. Johanns (in re Geertson Seed Farms)*,
   541 F.3d 938 (9th Cir. 2008) ...................................................................................... 33

*W. Watersheds Project v. Bernhardt*,
   391 F. Supp. 3d 1002 (D. Or. 2019) ................................................................... 31, 33, 35

*Walker v. Am. Red Cross*,
   No. 6:20-cv01755-MK, 2021 WL 1232669 (D. Or. Apr. 1, 2021) ...................................... 16

*Warm Springs Dam Task Force v. Gribble*,
   621 F.2d 1017 (9th Cir. 1980) ............................................................................... 25, 27

*Wild Va. v. Council on Envtl. Quality*,
   No. 3:20CV00045, 2020 U.S. Dist. LEXIS 166622 (W.D. Va. Sept. 11, 2020) ...................... 4

*Winter v. Natural Res. Defense Council*, 555 U.S. 7  (2008) ......................................... 6

**STATUTES**

42 U.S.C. § 4321 ................................................................................................... 3

42 U.S.C. § 4332(2)(C) .......................................................................................... 4

42 U.S.C. § 4332(2)(E) .......................................................................................... 4

MEMORANDUM IN SUPPORT—V

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

42 U.S.C. § 4342 ................................................................................................ 4

5 U.S.C. § 706(1), (2)(A) .................................................................................. 5

**RULES**

40 C.F.R. § 1500.1(b) ...................................................................................... 30

40 C.F.R. § 1501.5 ............................................................................................ 4

40 C.F.R. § 1502.9(d) ...................................................................................... 16

40 C.F.R. § 1502.9(d)(1)(ii) ..................................................................... 1, 4, 16

40 C.F.R. § 1508.10 ......................................................................................... 17

40 C.F.R. §§ 1500–1508 .................................................................................... 4

40 C.F.R.§ 1502.9(d)(1)(i) ........................................................................ 5, 16, 21

**OTHER AUTHORITIES**

Forest Service Handbook 1909.15 Ch. 10, Section 18.1 .......................................... 23

**GLOSSARY OF TERMS**

| Agency | United States Forest Service |
|---|---|

MEMORANDUM IN SUPPORT—VI

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

| APA | Administrative Procedure Act |
|---|---|
| BAER | Burned Area Emergency Response |
| Cascadia | Plaintiffs Cascadia Wildlands, Oregon Wild, and Willamette Riverkeeper |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Ex. | Exhibit |
| FOIA | Freedom of Information Act |
| Forest | Willamette National Forest |
| NSO | Northern Spotted Owl |
| NEPA | National Environmental Policy Act |
| SBS | Soil Burn Severity |
| SIR | Supplemental Information Report |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## INTRODUCTION

In the fall of 2020, wildfires burned extensively through a number of different Forest Service timber sales, finalized prior to the fires, but not yet implemented. The Forest Service maintains continuing jurisdiction over these projects and has an ongoing obligation to revise its NEPA analysis when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii)(2020); *see Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006). This means the agency must consider and take a hard look at whether or not the new information or changed circumstances are within the scope and range of effects considered in the original analysis. Ex. H at 99-100 (citing agency's NEPA handbook). Here the fires were significant changed circumstances, but instead of revisiting these projects under NEPA, all of which were thinning projects carefully designed to mimic fire impacts, the Forest Service renegotiated contracts with the purchasers and substantially changed logging prescriptions, unit boundaries, and project design features without ever notifying the public or parties who worked with the Forest Service on these projects. This is illegal. Accordingly, Cascadia respectfully requests this Court enjoin the immediate implementation of logging operations authorized under the Lang Dam and the Hwy 46 projects.[1]

## BACKGROUND

On April 29, 2021, while surveying the effects of the Holiday Farm Fire and associated roadside logging by the Oregon Department of Transportation, Plaintiffs Cascadia Wildlands and Oregon Wild ("Cascadia") discovered a large, recently implemented post-fire clearcut off

---

[1] Counsel for Defendant has advised counsel for plaintiffs that logging in Green Mountain project units is not imminent, therefore, and in an attempt to keep this request narrowly tailored, that project is not included in Plaintiffs' proposed preliminary injunctive relief.

MEMORANDUM IN SUPPORT—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Highway 19 on the Willamette National Forest. Decl. Cotton ¶¶ 9-11. No post-fire area salvage had been proposed, and Cascadia had been assured at a recent field visit with the agency, that none would. Decl. Cotton ¶ 13. When Cascadia inquired about the salvage logging, Darren Cross, District Ranger of the McKenzie River Ranger District of the Willamette National Forest, stated that logging activities were ongoing in that area with the Green Mountain and Lang Dam projects, both of which the Forest Service finalized in 2017, and the logging in question was part of the Lang Dam project. White Decl. ¶¶ 2-3.

The Lang Dam project had only contemplated green tree thinning followed by prescribed burning to mimic the beneficial impacts a fire would have on the area. The area discovered by Plaintiffs had burned extensively, which would preclude, and presumably eliminate, the need for any restorative logging because the fire had naturally thinned the forest. On May 26, 2021, Cascadia emailed Mr. Cross and asked why this burned area was clearcut under the Lang Dam decision, and Mr. Cross responded that "the prescription was affected by the Holiday Farm Fire." Decl. White ¶¶ 3-4. Mr. Cross also provided a list of seven other projects or timber sale units in that area that also burned that were going to be logged soon or were actively being logged. *Id.* ¶ 5. These units were not limited to the Lang Dam project, but included parts of the Green Mountain and Calapooia projects as well. All of these projects were largely green tree thinning projects and did not, as originally proposed and analyzed, consider post-fire logging.

The Forest Service is changing, without any further NEPA analysis or public involvement, green tree thinning projects to post-fire clearcutting. Cascadia requested additional information documenting these changes and any rationale. Cascadia received no response from the Forest Service, and soon thereafter, discovered that the Forest Service had removed the Green Mountain and Lang Dam project files from its website. Decl. White ¶ 10. On May 27,

MEMORANDUM IN SUPPORT—2

2021, Cascadia filed a Freedom of Information Act ("FOIA") request for records related to timber sale contracts modified because of the 2020 fires. Despite admitting the agency had responsive records, the Forest Service did not produce any records until August 26, 2021, after this case had been initiated. Cady Decl. ¶ 2.

On June 17, 2021, Cascadia submitted a formal notice of intent to sue the Forest Service and specifically alerted the agency to the fact that the 2020 fires and changed logging prescriptions both independently amounted to significant new information or changed circumstances that warranted revisiting these projects under NEPA and reconsulting with the Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS"). Cascadia received no response.

On August 18, 2021, Cascadia filed their initial complaint against the Forest Service naming the Green Mountain and Lang Dam projects. ECF 1. On September 13, 2021, Cascadia amended its complaint to add the Hwy 46 project. ECF 9. Ground disturbing impacts associated with the newly revised projects have been ongoing and specific logging activities in a number of Hwy 46 logging units will begin as soon as October 22, 2021. Cady Decl. ¶ 3.

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### A.  National Environmental Policy Act

Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. NEPA ensures that an agency carefully consider detailed information concerning significant environmental impacts, while guaranteeing that the relevant

MEMORANDUM IN SUPPORT—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

information will be made available to the public so that it may play a role in both the

decisionmaking process and the implementation of the decision. *See Dep't of Transp. v. Pub.*

*Citizen*, 541 U.S. 752, 768 (2004). To achieve these twin aims, NEPA and implementing

regulations set forth "action-forcing" procedures designed to (1) ensure that the agency took the

requisite "hard look" at the environmental consequences of the proposed action, and (2) foster

meaningful public participation. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

349–51 (1989).

To accomplish these purposes, NEPA requires all agencies of the federal government to

prepare a "detailed statement" for all "major federal actions significantly affecting the quality of

the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental

Impact Statement ("EIS"), the detailed statement must describe, *inter alia*, the adverse

environmental impact of the proposed action and alternatives to it. *Id.*; *see also id.* § 4332(2)(E).

An agency may prepare a less rigorous Environmental Assessment ("EA") for a "proposed

action that is not likely to have significant effects or when the significance of the effects is

unknown[.]" 40 C.F.R. § 1501.5.[2]

NEPA requires that agencies supplement their NEPA analysis when "[t]here are

significant new circumstances or information relevant to environmental concerns and bearing on

the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii)(2020). Supplementation is also

required when "[t]he agency makes substantial changes in the proposed action that are relevant

---

[2] The Council on Environmental Quality ("CEQ") promulgated regulations implementing
NEPA in 1978. *See* 42 U.S.C. § 4342 (establishing CEQ); 43 Fed. Reg. 55,978 (Nov. 29, 1978).
The 1978 regulations, with two minor amendments, were in place through 2019. *See* 40 C.F.R.
§§ 1500–1508 (2019); *Wild Va. v. Council on Envtl. Quality*, No. 3:20CV00045, 2020 U.S. Dist.
LEXIS 166622, at *4–5. (W.D. Va. Sept. 11, 2020). CEQ modified the NEPA regulations by
final rule on July 16, 2020. 85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. §§ 1500–
1508 (2021)).

MEMORANDUM IN SUPPORT—4

to environmental concerns." 40 C.F.R.§ 1502.9(d)(1)(i)(2020). A plaintiff need only raise

"substantial questions whether a project may have a significant effect" to trigger

supplementation. *See Boody*, 468 F.3d at 560 (9th Cir. 2006).

### B.      Administrative Procedure Act

Cascadia's NEPA claims are reviewed pursuant to the APA, 5 U.S.C. § 706(1), (2)(A).

*Or Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007). "The APA sets

forth the procedures by which federal agencies are accountable to the public and their actions

subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct.

1891, 1905 (2020) (citation omitted). Under the APA, "agencies must engage in reasoned

decisionmaking." *Id.* Agency actions must be "set aside" if they are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of

procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious

where the agency "relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, [or] offered an explanation for its decision

that runs counter to the evidence before the agency[.]" *Mtr. Vehicle Mfrs. Ass'n v. State Farm

Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). In the alternative, an agency's inaction

when confronted with significant new circumstances and information constitutes unlawful failure

to act in violation of 5 U.S.C. § 706(1). *Friends of the Clearwater v. Dombeck*, 222 F.3d 552,

560 (9th Cir. 2000).

### C.      Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish (1) it is likely to succeed on

the merits; (2) it will likely suffer irreparable harm absent the injunction; (3) that the balance of

the equities tips in the plaintiff's favor; and (4) that the injunction would serve the public

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

interest. *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).

Courts in the Ninth Circuit employ a "sliding scale" approach in which, for example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this approach, a preliminary injunction may issue where the plaintiff's likelihood of success is such that "serious questions going to the merits [are] raised and the balance of hardships tips sharply in plaintiff's favor." *Id.* This is often referred to as the "serious questions" approach. *Id.* at 1132. "Serious questions" are those that "cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1035 (1989). They are "substantial, difficult, and doubtful" such that they are "a fair ground for litigation and thus for more deliberative investigation." *Id.*

## FACTUAL AND ADMINISTRATIVE BACKGROUND

### I.    The 2020 Fires

In August and September of 2020, three major fires, the Beachie Creek, Holiday Farm, and Lionshead fires, burned across 571,435 acres of land in northwest Oregon. In total, the three fires burned approximately 176,000 acres of the Willamette National Forestland in a mosaic burn pattern. Cady Decl., Exhibit A at 1 (hereafter Ex. A).[3] The two fires relevant here are the Holiday Farm and Lionshead fires.

---

[3] All citations to exhibits will be exhibits from the Cady Declaration unless otherwise noted.

MEMORANDUM IN SUPPORT—6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The Holiday Farm Fire began on September 7, 2020, encompassed 173,439 acres of primarily mixed conifer forest, burned in a mosaic pattern through most of the area, and the majority burned with low and moderate severity. Ex. A at 1. The Lionshead Fire began on August 16, 2020 and encompassed 204,469 acres of semi-arid pine with brush understory; subalpine, true-fir, and lodgepole pine; and mixed conifer dominated closed canopy stands. Ex. B. at 1.

In late September 2020, the Forest Service assembled Burned Area Emergency Response teams for the two fires, composed of specialists in soils, geology, hydrology, engineering, botany, recreation, archaeology, fisheries, and GIS to begin assessing the post-fire effects to critical values on Forest Service lands. Ex. A at 1, Ex. B at 1. Both fires burned at mixed severities and in a mosaic pattern, which impacted the landscape in a variety of ways. Ex. A at 1-6; Ex. B at 2-6.

In areas where the fires burned at moderate to high severity, the fire created complex early seral stands, which the Forest Service has previously determined was lacking across the landscape given past and ongoing fire suppression practices. Ex. C at 14. The fires also created downed wood and snags, or standing dead trees, or damaged trees that will die over the next 10-20 years and provide critical habitat for older forest species. Ex. A at 6.

The fire also impacted soils. Ex. A at 1; Ex. B at 1. Soil burn severity ("SBS") is the primary characteristic driving post-fire soil erosion response and sediment delivery. Within the Holiday Farm Fire burned area, 63% of mapped areas on Forest Service managed lands experienced high and moderate SBS. Ex. A at 1. Within the Lionshead Fire burned area, 47% of Forest Service lands experienced high and moderate SBS. Across these areas, long-term soil productivity was identified as a critical value with a high risk of damage or loss. Ex. A at 2; Ex.

MEMORANDUM IN SUPPORT—7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

B at 2. Concerning geology and landslide risk, the Forest Service concluded for both fires that there is an elevated risk of instability in the form of rockfall and debris flows across much of the burned area, and the cumulative risks of various types of slope instability, sediment bulking, and channel flushing is high along many slopes and drainages in and below the burned areas. Ex. A at 2; Ex. B at 2.

Concerning hydrology for the two fires, the Forest Service concluded that the "[p]rimary watershed response is expected to include an initial flush of ash and burned materials, erosion in drainages and on steep slopes in the burned area, increased peak flows and sediment transport and deposition, and debris flows. These responses will likely lead to increased water quality concerns for municipal and domestic drinking water providers within and downstream of the fire." Ex. A at 3-4; Ex. B at 3-4.

Concerning wildlife, both fires burned within the range of northern spotted owl (NSO), a species that is listed as threatened under the Endangered Species Act. Ex. A at 5; Ex. B at 6-7. With the Holiday Farm Fire, in designated critical habitat for the NSO, 1,684 acres burned with high severity, totaling 12% of the critical habitat in the fire area, and 10,740 acres burned with moderate severity, totaling 77% of the critical habitat in the fire area. Ex. A at 5. With the Lionshead Fire, 9,056 acres of designated critical habitat for the NSO burned with high severity, totaling 26% of the critical habitat in the fire area. An additional 8,719 acres of designated critical habitat burned with moderate severity, totaling 25% of the critical habitat in the fire area. Ex. B at 6-7. For both areas, "threats include additional loss of habitat in the fire area due to blowdown, mass soil movement, flooding, and insects and disease," which "further reduce NSO suitable habitat and usable critical habitat and threaten the viability of nesting territories." Ex. A at 5; Ex. B at 7.

MEMORANDUM IN SUPPORT—8

"Streams and rivers affected by both the fires support runs of federally listed Upper

Willamette spring Chinook salmon (threatened), Upper Willamette steelhead trout (threatened),

and bull trout (threatened)." Ex. A at 5; Ex. B at 5. Potential post-fire effects in select tributaries

of the North Santiam River, Breitenbush River, Metolius River, McKenzie River, Middle Fork

Willamette River, and Upper Willamette River include increase in peak flow laden with debris

potentially leading to increase in accelerated channel scour and hillslope erosional processes,

increase in fine sediment leading to direct mortality of eggs and fry and decrease of habitat

elements such as pools, and increase in the likelihood of other negative effects to habitat from

increased flow interaction with infrastructure. Ex. A at 5; Ex. B at 5. Critical habitat for these

species occurs across the fire-impacted regions.

During and after the fires, tree-cutting occurred as part of firefighting activities and/or

post-fire salvage conducted by private timber owners, the Oregon Department of Forestry, the

Oregon Department of Transportation, the Bureau of Land Management, and the Willamette

National Forest. The Willamette National Forest recently authorized over 400 miles of roadside

salvage logging across the burned areas of these two fires.

## II.    The Lang Dam Project

The Lang Dam project area includes multiple subwatersheds of the McKenzie River and

the South Fork McKenzie River and areas near the Cougar Reservoir. Cady Decl. Ex. E at 1. The

project would have conducted commercial harvest across 630 acres of 40 to 120-year-old forest

stands. *Id.* More specifically, the project involved 331 acres of commercial thinning, 120 acres of

riparian reserve thinning, 39 acres of gap creation, and 25 acres of dominant tree release. *Id.* The

Forest Service determined that both riparian and upland thinning was needed to "promote stand

health and vigor" and "increase diversity and structural complexity" "through variable density

MEMORANDUM IN SUPPORT—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

thinning (skips and gaps)*." Id.* at 2. The logging was to be followed by broadcast burning across 475 acres to create structural complexity, downed wood and snags from fire-intolerant species, and increase spatial heterogeneity. *Id.* The project was designed to mimic a fire in the project area.

The Forest Service determined that the project would impact chinook salmon, bull trout, and the northern spotted owl, but the negative impacts to listed and sensitive species were not significant because "no other reasonably foreseeable actions would remove young managed forest habitat in the sub-watersheds," the "action alternative is expected to maintain the viability of all wildlife species that utilize this habitat." *Id.* at 8.

Plaintiffs were involved extensively in the development of the Lang Dam project and participated in a field tour of the riparian logging units. *Id.* at 6-7, 13-14. Older logging units were dropped as result of citizen wildlife surveys conducted by Plaintiffs and its members. *Id.* at 13. Plaintiff Oregon Wild administratively objected to project, and although no objection resolution agreement was reached, adjustments to the project were made to accommodate raised concerns. *Id.* at 13-14.

### III.    The Hwy 46 Project

The Hwy 46 project encompasses an area of approximately 31,295 acres in the Breitenbush Watershed approximately 6 miles northeast of Detroit, Oregon in Marion County. Ex. C at 26; Ex. D at 7. It consists of forests managed by the Willamette National Forest and 159 acres of private property, the Bretienbush resort and surrounding cabins. *Id.* The Hwy 46 project is large and complex. It involves logging in Late-Successional Reserves, Riparian Reserves, and matrix lands as well as four different land allocations that implicate different retention standards related to scenery. Ex. C at 37-40.

MEMORANDUM IN SUPPORT—10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

As originally approved, Hwy 46 would have logged approximately 1,992 acres including 954.95 acres of thinning outside Riparian Reserves, 364 acres of thinning in Riparian Reserves, 483 acres of skips, 44.3 acres of gaps, and 26.75 acres of dominant tree release ("DTR"). Additional treatment included creation of quality early seral habitat and sugar pine restoration occurring over 27 and 92 acres, respectively. Ex. D at 11. The project's original purposes included: (1) improving stand growth, diversity, and structure and moving stand structure from an overabundance of mid-seral stands to increase early and late seral stand structure in the watershed; (2) reduce hazardous fuels; (3) restore sugar pine stands and meadows. *Id.* at 8. At the time the project was approved, less than 4% of the project area was early seral habitat, and a major objective of the project was to increase the area of early seral, post-fire habitat to 9% which is closer to historical levels. In large part, the project was designed to mimic a fire in the project area. *Id.*

The thinning in both riparian and upland areas of the proposed projects were needed to reduce tree densities to improve stand conditions, diversity, density, and structure in the project area. *Id.* at 8-10. The Forest Service included sugar pine restoration and meadow creation because fire-suppression in the area had resulted in unusually high stand densities. *Id.* at 9-10. This logging would be followed by prescribed burning which would kill up to 10% of the trees to create snags, promote early seral species, improve big game forage. This prescription "allows for a controlled replication of the natural fire disturbance process while minimizing threats to public safety and private property." Ex. C at 107-108.

Given the project's proposed logging of mature, fire-regenerated forests, the project area's proximity to Breitenbush Resort and Conference Center, and its popularity for a variety of recreational uses, the project was a high priority for Plaintiffs and their members. Starting in

MEMORANDUM IN SUPPORT—11

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

2011, Plaintiffs participated extensively in the administrative process leading up to this project.

Plaintiffs attended numerous tours and visits with the Forest Service and Breitenbush staff and

board members, submitted, scoping, EA comments, and formal objections. Ex. D at 21-22; Krop

Decl. ¶¶ 5-18.

Plaintiffs engaged in a long objection resolution process with the Detroit Ranger District

that resulted in an eventual agreement to forestall litigation over the Hwy 46 project. The

agreement involved Breitenbush resort, individual property owners and homeowners, and several

conservation groups. Krop Decl. ¶ 16. As part of an agreement to forgo litigation, the Forest

Service converted units from regeneration harvest to thinning, agreed to not log any trees over 30

inches DBH, and *dropped timber sale units impacted by the 2017 Scorpion Fire because the fire*

*naturally satisfied the purpose and need for the logging project which was to reduce tree density*

*and create post-fire habitat and ecological conditions. Id.*; *see also* Ex D at 19.

### IV. 2020 Fire Impacts to Lang Dam and Hwy 46

Leading up to the summer of 2020, large portions of both the Hwy 46 and Lang Dam

projects had yet to be implemented. The 2020 fires greatly impacted these projects.

*Lang Dam*

The Holiday Farm Fire burned 340 of the 463 acres of proposed treatment acres. Ex. H at

21. The burned areas were all part of previous sold, but unimplemented, timber sales that the

purchasers were still interested in logging. *Id.* During the fire, hazard trees were felled along

priority access roads that passed through the project area. *Id.* The fire burned freely through the

project area in a mosaic of high, moderate, and low burn severities across 10 of 20 harvest units.

Ex. G at 1. "The Holiday Farm Fire changed circumstances in the planning area that required

supplementation of the Lang Dam EA." *Id*. The original purpose and need for treating Riparian

MEMORANDUM IN SUPPORT—12

Reserves analyzed under the Lang Dam EA is no longer applicable to the fire affected units because the fire resulted in a complex mosaic of tree mortality in Riparian Reserves and commercial thinning would no longer be an appropriate method to attain Aquatic Conservation Strategy Objectives. *Id.* The fire also impacted the suitability of spotted owl habitat in the project area. Ex. H at 31.

*Hwy 46*

"Most of the harvest units of Hwy 46 were in the Lionshead Fire perimeter," and "the fire burned freely through the Hwy 46 project area." Ex. F at 1. Approximately 1,609 acres out of 2,181 acres proposed for treatment were burned. The burned areas were all part of previous sold, but unimplemented, timber sales which the purchasers still wanted to log. *Id.*

Twenty-eight northern spotted owl activity centers overlap the Hwy 46 project area, and the 2020 fires removed substantial amounts of northern spotted owl suitable habitat, burning some spotted owl territories to the extent that the Forest Service assumed they are no longer viable. *Id.* at 2.

The fires drastically impacted soils. *Id.* at 8. The Forest Service used satellite imagery to produce a Burn Area Reflectance Classification (BARC) map and determined that 68 timber sale units had moderate to high soil burn severity, leading to increased risk of erosion, sedimentation, and landslides. Of these 68 units, 57 are on slopes greater than 20-30 degrees. *Id.*

The 2020 wildfires also had "subsequent direct and indirect effects on the hydrology of the Hwy 46 project area that occurred prior to much of the planned Hwy 46 timber harvest." *Id.* at 4. The 2020 fires killed trees in the riparian reserves and affected soils along waterways. This decreased "decreased shade, altered riparian area composition, and increased runoff and sediment delivery to streams." *Id.* Stream temperatures are expected to increase throughout the

MEMORANDUM IN SUPPORT—13

watershed. *Id.* at 6. "Surface runoff and peak flows have increased post-fire due to the loss of

canopy interception, decreased soil infiltration and increased surface runoff in burned areas. The

BAER report estimated an increase in peak flows 1-4 times." *Id.* at 5. Additionally, changes from

the fire and subsequent fall and early winter storms in 2020 led to the creation of several new

streams and a moderate increase in peak stream flows. *Id.* "In areas of high tree mortality,

streams that were classified as intermittent may flow all through the dry season. In addition, new

stream channels are likely to be discovered in sale units during boundary adjustment and

harvest." *Id.* 5. Surface runoff and impacts to water quality are increased because of the fires. *Id.*

at 6.

The fires also damaged roads, culverts and corresponding timber haul routes. This

damage leads to increased risks of sediment delivery. *Id.* at 6-7. The fires impacted 220 acres of

high-probability cultural sites. SIR at 8-9. The fires burned and impacted four populations of rare

botanical species. *Id.* at 10. The fires impacted invasive species populations in the project area,

and "could greatly increase population." *Id.* at 11.

<u>**ARGUMENT**</u>

**I.     Cascadia Has Standing to Bring This Case.**

Cascadia Wildlands and Oregon Wild are non-profit organizations whose missions and

members' interests are harmed by the Forest Service's actions and failure to act. As set forth in

the declarations filed herewith, these organizations' members, supporters, and staff, extensively

use and enjoy the Green Mountain, Lang Dam and Hwy 46 project areas for a variety of personal

and professional recreational, scientific, and spiritual purposes and have firm plans to return. *See*

Cotton Decl. ¶ 5 (describing use and enjoyment of burned forests for bird watching, foraging for

berries and mushrooms, and hiking); Krop Decl. ¶¶ 21, 22, 36 (describing use of the Breitenbush

MEMORANDUM IN SUPPORT—14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

area to fly fish, hunt, and desire to visit summer homes after they are rebuilt); Heiken Decl. ¶¶ 6-

7. This is sufficient to confer standing. As the Ninth Circuit has recently explained to have

standing to seek injunctive relief:

> "a member of an environmental group must show that he "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir.2010).

*Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013).

Here, Plaintiffs have established that they have repeatedly visited the Lang Dam and Hwy

46 project areas for recreational and aesthetic purposes. Cotton Decl. ¶¶ 9-10; Krop Decl. ¶¶ 5-

21; Heiken Decl. ¶ 6-7; Plaintiffs have also sufficiently established that they have concrete plans

to continue using these areas for recreational and aesthetic purposes. Cotton Decl. ¶ 7; Krop

Decl. ¶¶ 22, 36-37; Heiken Decl. ¶¶ 9-10; Finally, Plaintiffs have sufficiently established that

they have recreational or aesthetic interests that would be harmed by the challenged logging

project. Krop Decl. ¶ 24, 32, 37(witnessing the post-fire logging that has occurred thus far is a

"far more traumatic of an experience than the fire itself. Salvage logging of these areas will

irreparably damage my opportunities to mushroom forage, hike, and enjoy these unique early-

seral ecosystems."); Heiken Decl. ¶ 10.[4] Opportunities to engage in hiking, mushroom foraging,

fishing, research activities and more for Cascadia Wildlands and Oregon Wild members would

be irreparably damaged if logging moves forward, but redressed by the remedy requested. *See*

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 572–73 n.7 (1992).

---

[4] Because Cascadia et al.'s members have standing, Plaintiffs themselves have organization standing to bring the case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 181 (2000).; *see also* Cotton Decl. ¶ 3 (Cascadia Wildlands' mission); Heiken Decl. ¶¶ 3, 4, 11.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**II.     Cascadia is Likely to Succeed on the Merits of its Claim that the Forest Service Violated NEPA by Failing to Supplement its NEPA analyses**

Cascadia moves for preliminary relief on its first, and second (alternative) claims *See* First Amended Complaint at ¶¶ 195-220, ECF9. The Holiday Farm and Lionshead fires, 100-year weather events, directly burned large swaths of unimplemented portions of the Lang Dam and Hwy 46 Projects. The fires resulted in significant new information and changed circumstances that requires NEPA supplementation. *See* 40 C.F.R. § 1502.9(d)(1)(i)(2020) (Supplementation required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."). In response, and instead of complying with their NEPA duties, the Forest Service changed the logging projects, altered prescriptions, unit boundaries, and project design features, again without engaging in the required supplementation. *Id.*

**A.     The 2020 Fires resulted in significant changed circumstances.**

NEPA does not permit agencies to stand idly by after making their decisions.  Rather, the agency must be alert to changing conditions, and supplement its analysis where a project is substantially changed, or where new information reveals that the project will impact the environment in significant ways that were not previously addressed or considered.  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)); *see also* 40 C.F.R. § 1502.9(d).

As this court has previously acknowledged, the 2020 wildfire season drastically affected the Oregon cascades, the Willamette National Forest, and the surrounding towns and cities. *See Walker v. Am. Red Cross*, No. 6:20-cv01755-MK, 2021 WL 1232669, at *1 (D. Or. Apr. 1, 2021) ("The Holiday Farm Fire began on September 7, 2020. Since that time, the wildfire burned over 173,000 acres in and around the McKenzie [sic] National Forest, destroying property and

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

displacing thousands of residents."). This Court has even recently stated that "[g]iven Oregon's historic and devastating 2020 fire season, a new EA will allow BLM to take into account a significant change in circumstances." *Cascadia Wildlands v. BLM*, Case No. 6:20-cv-01395-MK, *26, fn 5 (D. Or. Sept. 13, 2021) (regarding the Thurston Hills which was near but not directly burned by the Holiday Farm Fire).

Here, the Holiday Farm Fire and the Lionshead Fire "burned freely" through unimplemented portions of the Lang Dam and Hwy 46 timber sales. This obviously impacted these projects in a number of significant ways, but instead of supplementing NEPA, the Forest Service attempted to deal with these changed circumstances through Supplemental Information Reports (SIRs). "Supplemental Information Reports are nowhere mentioned in NEPA or in the regulations implementing NEPA promulgated by the Council on Environmental Quality." *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 565-6 (9th Cir. 2000); 40 C.F.R. § 1508.10 (defining the term "environmental document" as including Environmental Assessments, Environmental Impact Statements, Findings of No Significant Impact, and Notices of Intent).

Courts have nonetheless recognized a "limited role within NEPA's procedural framework for SIRs and similar 'non-NEPA' environmental evaluation procedures." *Idaho Sporting Congress* at 566. "Specifically, courts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Id.* In condoning the use of SIRs, however, the Ninth Circuit has "repeatedly warned that once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Id.*

Here, the Forest Service admits "significant impacts from operations beyond the scope and range of effects considered in the initial analysis," but asserts it can mitigate or nullify these

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

impacts "if IDT recommendations, additional design features, and the updated prescription are adhered to." Ex. F at 11 (emphasis added); Ex. G at 1 ("changes to project implementation necessary to stay within assessed impacts of the LD timber sale.").

Project changes aside, this initial admission of significance requires NEPA supplementation. *Idaho Sporting Congress v. Alexander*, 222 F.3d at 566 (if "new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute."); *see also Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.,* 113 F.3d 1505, 1508-09 (9th Cir. 1997); *see also Olympic Forest Coalition v. United States Forest* Service, 556 F.Supp.2d 1198, 1207 (W.D. Wash. 2008). An SIR can only be used "to make the initial significance determination, not to supplant any documentation that would be required if the threshold were met." *Price Road*, 113 F.3d at 1510.

In any case, the incomplete record in this case is replete with evidence documenting all the different significant impacts from the fires on these logging projects. Additionally, the "changes to project implementation," through which the Forest Service was attempting to address or mitigate these fire impacts, are also changed circumstances that warrant NEPA supplementation. *See Price Road* at 1508-09 ("if the environmental impacts resulting from the design change are significant or uncertain, as compared with the original design's impacts, a supplemental EA is required").

<u>*Burned Logging Units*</u>

The Holiday Farm Fire burned 73% of the forest stands (1,609 of 2,121 acres) proposed for logging in the Highway 46 Project and the Lionshead Fire burned 73% acres of the stands (340 of 463 acres) proposed for logging in the Lang Dam Project. Ex. F at 1; Ex. G at 1. This burning was significant enough that the agency employed a contractual contingency: "Damage

MEMORANDUM IN SUPPORT—18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

by Catastrophe." Ex. H at 102. These contingencies are declared when it is "uneconomical or unfeasible to log due to the severity of the burn within those units," and modifications are needed "to permit harvest of catastrophe-affected timber and other associated provision [sic] that were affected due to the *changed conditions resulting from the Holiday Farm Fire.*" Ex. H at 102, 97-98 (emphasis added).[5]

The fires' effects were first discussed generally by the Forest Service's Burned Area Emergency Response ("BAER") team. The BAER produced reports for the Holiday Farm and Lionshead Fires, which concluded that the fires had affected stand density and seral stage, amount of downed wood and snags, soil damage, erosion and sediment delivery, geological stability and landslide risk, water quality, fish and wildlife habitat, cultural resources and recreation. *See* Ex A at 1-6, Ex B at 2-7.

Through a combination of limited site-visits and this BAER satellite data, the Forest Service began to compile information pertaining to fire impacts to these two projects. Ex. F at 2. One of the forest resources heavily impacted by these fires was soil. *Id.* (Fire effects to soils are complex and wide-ranging"). Within Hwy 46, 68 timber sale units burned at moderate to high soil burn severity, and 57 of those units are on steep slopes, such that there is "an increased risk of erosion and sedimentation." Ex. F at 8. In Lang Dam, "[t]he resulting exposed soil would increase the likelihood of detrimental soil compaction and increased sediment transport to streams . . . harvest operations could cumulatively add to those effects." Ex. H at 35. "Increased surface runoff onto roads in recently burned, unvegetated ditch lines and hillslopes are also a likely source of increased sediment delivery to streams following wildfire;" and hauling during

---

[5] A "Damage by Catastrophe" determination was likely made for Hwy 46 as well, Cascadia just does not have those records yet.

MEMORANDUM IN SUPPORT—19

wet season conditions increases this risk. Ex. F at 6. For the Hwy 46 units, the fires melted all the recently installed culverts along the primary haul route, further exacerbating sedimentation concerns. Ex. F at 6.

Concerning owls, both projects proposed logging in spotted owl habitat and would have impacted the species. Ex. E at 11; Ex. F at 2 ("[t]wenty eight northern spotted owl activity centers overlap proposed activities of the Hwy 46 project). The fires removed or degraded this habitat, and individual spotted owl sites have been rendered non-viable. Ex. H at 31, Ex. F at 2. Whereas prior logging prescriptions would maintain habitat function for northern spotted owls, Ex. C at 176, ("remain habitat after thinning."), the Forest Service admits that salvage harvest could now impair owl territories and remove or downgrade habitat. Ex. F at 3-4.

Concerning noxious weeds, the fires had an unknown effect, but "could greatly increase population." Ex. F at 11; *see* Ex. H at 11 ("increased risk of introduction and spread of noxious weeds due to more bare ground."). Regarding riparian impacts, the fires resulted in decreased stream shading, increased stream temperatures, increased peak flow risks, and even new perennial streams. Ex. H at 34-35; Ex. F at 6-7.

Courts have repeatedly held that agencies must supplement NEPA when new information comes to light about potentially significant effects to relevant resources. *See Sierra Club v. Bosworth*, 465 F. Supp. 2d 931, 940 (N.D. Cal. 2006) (new information about status of the Pacific fisher and project's effects to species required NEPA supplementation); *Gallatin Wildlife Ass'n v. USFS*, 2016 WL 3282047, at **10-11 (D. Mont. June 14, 2016) (requiring agency to consider supplementing analyses due to bighorn sheep's reintroduction to the area, its designation as a "sensitive species," and new information on disease transmission from domestic sheep); *Friends of the Clearwater*, 222 F.3d at 558-59 (agency violated NEPA by failing to

MEMORANDUM IN SUPPORT—20

evaluate whether new sensitive species designations were significant enough to require supplemental analysis).

Court have specifically recognized that fires change conditions on the ground, and that the Forest Service's failure to take a "hard look" at the impacts of wildfires and post-fire logging in the context of timber sales were arbitrary and capricious. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1210, 1214 (9th Cir. 1998) (holding proposed timber salvage sales in an area burned by a large wildfire required novel analysis because the forest plan EIS "d[id] not, and could not, evaluate the impacts of this catastrophic fire, or the additional environmental impacts that large scale logging of severely burned areas could bring.").

Again, regardless of the Forest Service's proposed changes, supplementation is required because these impacts are significant. In condoning the use of SIRs, the Ninth Circuit has "repeatedly warned that once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Idaho Sporting Congress v. Alexander*, 222 F.3d at 566.

<u>*Changed Logging Prescriptions*</u>

An agency must prepare a supplemental NEPA analysis if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R.§ 1502.9(d)(1)(i) (2020). The Ninth Circuit has interpreted this regulation to mean that when an agency changes a project, it must supplement its NEPA analysis unless (1) the new alternative is only a "minor variation" of one of the alternatives considered in the original NEPA analysis, and (2) the new alternative is "qualitatively within the spectrum of alternatives" that were discussed in the EIS. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (quoting Forty Most Asked Questions Concerning CEQ's National

MEMORANDUM IN SUPPORT—21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (March 23, 1981)). *See also California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982) (concluding that supplemental analysis is required when the selected alternative "could not fairly be anticipated by reviewing the draft EIS alternatives").

Here, the original NEPA documents did not contemplate post-fire salvage logging, but instead proposed green tree thinning. "Thinning the overstocked stands would make more growing space and resources (sunlight, water, and nutrients) available to the remaining trees, resulting in decreased tree stress and development towards larger diameter stands. Stand vigor would also be increased as released trees develop into larger trees sooner, accelerating the development of some late successional characteristics. Structural diversity of the stands would be enhanced and tree species diversity would be increased." Ex. D at 8; Ex. E at 2 ("promote stand health and vigor" and "increase diversity and structural complexity" through "commercial thinning"). The Forest Service selected these stands for thinning because they were too "dense" or "overstocked." Ex. D at 8; Ex. E at 2.

In changing the logging prescriptions, the agency acknowledged an entirely new objective for the logging: "Prescription Objective: Capture the value of dead and dying fire damaged trees." Ex. H at 23; *see also Id.* at 3 ("Great news . . . we can harvest all the burned trees*."); Id*. at 50 (Modified Timber Sale Contract for Lang Dam SBA Timber Sale). The implemented salvage logging in the Lang Dam units has amounted to near total tree removal or "clearcutting." *See* Cotton Decl. ¶¶ 10, 11, photos post-logging). The original thinning prescriptions for this sale would only log on average 189 trees per acre out of an average of 435 trees per acre. Ex. I at 46. The revised prescription, even factoring in all of the timber volume

MEMORANDUM IN SUPPORT—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

loss from the fires and nearly 100 acres in overall reduction is still over 1,000 million board feet

more in volume (8,666 MMBF v. 9,944 MMBF) than the original sale. Ex. H at 59.

This salvage logging is outside the scope of anything considered in the original NEPA

documents, and therefore, as the Forest Service acknowledges, supplementation was required. [6]

*Id.* at 99-100 (email from Hambrick stating that supplementation is required if not staying within

the original purpose and need, and citing Forest Service Handbook 1909.15 Ch. 10, Section 18.1

("Consideration should be given to whether or not the new information or changed

circumstances are within the scope and range of effects considered in the original analysis.")).

In addition to adding salvage, the Forest Service admits the former purpose and need was

met by the fires. In the post-fire reports and discussion of fire impacts, the Forest Service

explicitly acknowledges that fire has eliminated the purpose and need to log in riparian areas,

and subsequently dropped logging in riparian areas. *See* Ex. H at 29 ("It is my determination that

a changed condition now exists in Riparian Reserves in these fire affected units. The original

purpose and need for treating Riparian Reserves under the Lang Dam EA is no longer applicable

to these units. . . the fire has resulted in a complex mosaic of tree mortality."); *see* Ex F at 2

(saying the same).

While the agency does not make explicit admissions regarding the upland logging

portions of these projects, both the upland and riparian logging share the same purpose and need,

which was to reduce tree density to improve stand conditions. *See* Ex. E at 2, 4 ("promote stand

---

[6] In a previous case, the Forest Service itself filed declarations explaining how a fire obviated the
purpose and need of a project with similar objectives to Hwy 46 and Lang Dam, requiring it to
withdraw the project entirely. *See Sequoia Forestkeeper v. United States Forest Serv.*, No. CV F
07-1690 LJO DLB, 2008 U.S. Dist. LEXIS 115831, at *15-16 (E.D. Cal. Nov. 19, 2008)
(describing Forest Service declaration explaining that "any new proposal for action would
require development of a new purpose and need to reflect the changed circumstances that exist as
a result of the Piute Fire.")

MEMORANDUM IN SUPPORT—23

health and vigor" and "increase diversity and structural complexity on about 592 acres" through commercial thinning" and "(skips and gaps)"); *see* Ex. C at 14, 18 at ("Table 2") ("improve stand conditions, diversity, density and structure with thinning, gaps, and dominant tree release").

Despite the fact that the fire burned both riparian and upland areas and the logging in both areas was designed to reduce density and increase complexity, the agency decided to proceed with the upland logging, with no further NEPA analysis. This is not rational, particularly given that interdisciplinary ("ID") team staff repeatedly voiced concerns that the purpose and need was likely met or eliminated for the upland portions as well. Ex H at 17 ("the purpose and need for thinning in RR's is no longer applicable. I can't say whether the P&N for thinning in the uplands is still applicable, but there may be impacts to aquatic resource that would be associated with the harvest that are outside the scope of what was analyzed in the EA. For example, downed wood and standing dead wood is very different now."); *see also Id.* at 36 ("Wondering if previous NEPA Purpose and Need is still applicable (similar discussions on Detroit)."). Instead of addressing this raised purpose and need issue, Ranger Darren Cross replied that "**[t]here is no more time to reflect on these. The ship is leaving the dock now.**" *Id.*

The Forest Service's decision to forge ahead with logging when the reason the agency chose to log those areas in the first place has been undermined is unreasonable. *See Tongass Conservation Soc'y v. Cole*, No. 1:09-cv-00003 JWS, 2009 U.S. Dist. LEXIS 129952, at *12 (D. Alaska Dec. 7, 2009) (requiring the Forest Service to supplement NEPA when the Forest Service's analysis of economics, "one of the main reasons for selecting [the chosen alternative]," was undermined by new information). Developing ways to "salvage" existing timber sale contracts is not the purpose of the significance inquiry that the Forest Service was required to take after the fires. *See Friends of the Clearwater*, 222 F.3d at 558.

MEMORANDUM IN SUPPORT—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**B.     The Forest Service SIRs do not satisfy NEPA**

When considering new information or changed circumstances, an agency is required to

make a reasoned determination whether it is of significance as to require formal NEPA

procedures. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023-24 (9th Cir. 1980).

Courts have held that this review must include a "hard look" to decide whether a supplemental

EIS is required by new information or changed circumstances. "An agency cannot rest on the

conclusions made by an EIS or EA but instead maintains a continuing obligation to take a 'hard

look at the environmental effects of its planned action, even after a proposal has received initial

approval.'" *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931, 936 (N.D. Cal. 2006), *citing Marsh v.

Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).

Here, the Forest Service made a decision not do additional NEPA *before* it evaluated the

significance of either the fire or changing the logging from thinning to salvage logging. It then

prepared Supplemental Information Reports (SIRs) to attempt to shield itself from its duties to

take a "hard look" at the information and to improperly *post hoc* rationalize its decision. SIRs are

intended to be the document that assists the agency to make the significance determination, not

justify its decision not to supplement. *Price Rd. Neighbor. Ass'n v. United States Dept. of

Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997).

Here, the Forest Service leadership decided to push the logging forward with a SIR, and

pressured ID team members to "paper the file" such that no further analysis was required. For

example, in the ID team meeting in December, 2020 on the Lang Dam timber sale, the notes

state that Ranger Cross started the meeting by asking "what would it take to implement the

project within the analysis you already did? Let me know what the risks are. This is our highest

priority until mid-January so we can tell the purchasers what's going on." Ex. H at 11. Ranger

MEMORANDUM IN SUPPORT—25

Cross also said: "We can change the project the way we need to meet NEPA obligations and then negotiate with the purchaser." And in the January 2021 ID team meeting, after Mr. Helstab expressed concerned about the purpose and need no longer being applicable, and other team members expressed other concerns, the notes say, in bold, "[Ranger Cross] would like to move forward and use the SIR." *Id.* at 38. The decision to go forward with the SIR without further addressing the issues raised by the members of the ID team demonstrates a failure to take the required "hard look" at the changed conditions from the fires and evaluate their significance. *Warm Springs*, 621 F.2d at 1023-24 (when considering significant new information or changed circumstances in this way, an agency is required to "make a reasoned determination whether it is of significance as to require formal NEPA procedures.").

The court should not defer to the agency's determinations and analyses made in the SIR regarding significance because "the type of deficiency here is a procedural one" at its core, requiring no judicial deference. *Olympic Forest Coal. v. United States Forest Serv.*, 556 F. Supp. 2d 1198, 1208 (W.D. Wash. 2008). "In condoning the use of SIRs, courts have repeatedly warned that once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Id*. at 1206. Crucially, the SIR can only "make the initial significance determination, not to supplant any documentation that would be required if the threshold were met." *Price Rd. Neighbor. Ass'n v. United States Dept. of Transp*., 113 F.3d 1505, 1510 (9th Cir. 1997).

In addition to this glaring procedural deficiency, the SIRs themselves were rushed and cursory, and failed to satisfy the "hard look" standard. While considering whether the agency satisfied the "hard look" standard in determining if EIS supplementation was required, the court may apply the reasonableness standard and factors similar to those considered when deciding

MEMORANDUM IN SUPPORT—26

whether an agency should prepare an original (i.e., not supplemental) EIS and may look at the environmental significance of the new information; its probable accuracy; the degree to which the agency considered the new information and evaluated its impact; and the degree to which the agency supported its decision not to supplement its EIS with explanation or additional data. *Warm Springs*, 621 F.2d at 1024; *see also Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616 (D.C. Cir. 2021).

The Lang Dam SIR fails to even take on the question of significance, let alone take the requisite hard look. *See* Ex. G. In addition to a complete failure to analyze the environmental significance of the Holiday Farm Fire's impacts, it also failed to document the agency's consideration of this new information and how it affected the baseline conditions in the project areas, or whether the purpose and need is still relevant. Instead, the agency provided only conclusory statements and a list of project changes that it apparently believed would mitigate "resource concerns" to "stay within the analysis completed in the Lang Dam EA." Ex. G at 1. A SIR entirely lacking a disclosure of effects cannot substitute for NEPA analysis. *See Idaho Rivers United v. Probert*, No. 3:16-cv-00102-CWD, 2016 U.S. Dist. LEXIS 63767, at *53-54 (D. Idaho May 12, 2016) (finding plaintiffs likely to succeed on the merits of their supplemental NEPA claim because Forest Service's conclusory statements about whether wildfires constituted a significant change were not a "hard look"); *Sierra Club v. Bosworth*, Nos. C 05-00397 CRB, C 05-00898 CRB, C 04-02588 CRB, 2005 U.S. Dist. LEXIS 27573, at *20 (N.D. Cal. Nov. 14, 2005) (noting that SIRs "should not be approved where they do not properly satisfy the fundamental objectives and requirements of NEPA" and finding that SIRs require more than a "cursory evaluation" of relevant information.).

MEMORANDUM IN SUPPORT—27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The Highway 46 SIR similarly fails to draw a conclusion regarding the significance of either the new information/changed circumstances or even analyze proposed changes to the project. While it lists some new resource concerns that arose due to the fire, a hard look is not taken. As an initial point, unlike Lang Dam, most of the Hwy 46 SIR analysis is largely based on satellite data and not on the ground field work or surveys. Ex. F at 2, 7. The agency admits important surveys still need to be completed. Previously active owl sites were assumed to be inactive based on satellite estimates of burn severity and were not surveyed. *Id.* at 3. Concerning cultural resources, the agency states "there are a total of 10 known cultural resources that need to be monitored. It is also recommended that high probability units that burned at low soil burn severity near the Breitenbush community be re-surveyed." *Id.*at 9. Regarding noxious weeds, the agency says the fires had an "Unknown effect, could greatly increase population, needs post-fire survey" *Id.* at 11. But, prior to completing these surveys that would inform "significance," the agency signed off on the SIR.

The agency also repeatedly admits that a hard look was not taken for certain resources. For example, the agency admits that "[f]ire effects to soils are complex and wide-ranging; as such, a full analysis of this topic is beyond the scope of this Supplemental Information Report (SIR)." *Id.* at 8. The agency does not disclose or analysis cumulative impacts despite admitting their existence: "[a]nalysis of the cumulative effects of the wildfires itself on the watershed or the cumulative effects of the wildfires and other danger tree work are considered, but are not the focus of this report." *Id.* at 5. The agency does not model peak flow impacts despite acknowledging increased post-fire risk because "[t]he ARP model for analyzing peak flow responses to harvest was not re-run for this review because it is not designed for burned areas and would not be an appropriate use. *Id.* at 5. Ultimately, the agency entirely failed to take a hard

MEMORANDUM IN SUPPORT—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

look, and where it did have information about changed impacts, it ignored that information and came to a conclusion of non-significance that is contrary to the evidence before it. contrary to the evidence. *See Tongass Conservation Soc'y v. Cole*, No. 1:09-cv-00003 JWS, 2009 U.S. Dist. LEXIS 129952, at *20 (D. Alaska Dec. 7, 2009)(where SIR draws conclusion contrary to the evidence, hard look was not taken).

Furthermore, to the extent the Forest Service is representing that the 2020 fires did not have a significant impact, or that the agency can "mitigate" the changes on the ground by salvage logging, Plaintiffs strongly contest these positions. Cascadia includes the declaration of Dominick DellaSala, Ph.D., a forest ecologist with expertise in the effects of salvage logging in post fire landscapes, to demonstrate that disagreement. *See* Decl. DellaSala, Exs. A and B. Dr. DellaSala cites to research publications documenting post-fire logging effects including: increased soil erosion, hydrological disturbance, loss of shade and moisture, alteration of river channels, increased combustible fuels onsite, extirpation of native species, reduced vegetation biomass, reduced species richness, removal of large dead woody structure, alternation of post-fire wildlife habitat, increases in invasive species, reduction in conifer regeneration, loss of cavity nester habitat, avoidance of logged areas by wolf-ungulate system, adverse effects to fishers, increase in successive fire events, loss of soil nutrients, and a negative effect on bird communities. DellaSala Ex B at 8-15. Dr. DellaSala concludes that "salvage logging is substantially more severe in its adverse impacts than logging in green forests (thinning from below, retention of large trees)." Id. at 8. He further concludes that the Forest Service's determination that the post-fire logging stays below the significance threshold is not supported by the best available science and that the Forest Service "fails to see the complex forest for the biological legacies or the connection across successive stages, and ignores the substantial

MEMORANDUM IN SUPPORT—29

damage resulting from salvage logging that will impacts forests for decades to come." Id. at 15.

Notably, DellaSala also states that "had the proposed changes to the project been available to the

public I would have made the same assessment." Decl. DellaSala, ¶ 2. In sum, the change from

restoration-focused thinning to salvage logging that leaves hardly a tree standing (see Decl.

Cotton at ¶ 10 and attached photos) is substantial and requires supplementation in order to

adequately disclose and consider the significantly differing effects.

The failure of the agency to supplement NEPA precluded Plaintiffs and all others from

challenging or raising competing scientific opinions and studies or on-the-ground information

pertaining to the Forest Service's substantial changes to the project, contrary to NEPA's intent.

*See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public

scrutiny are essential to implementing NEPA.") The agency admits that without these post-fire

changes to the project, the impacts will be outside of what was considered in the original NEPA,

as is evident from how the new prescriptions are being implemented on the ground. These

substantial changes require supplementation, and an injunction is warranted.

These SIRs are post-hoc attempts by the Forest Service to justify allowing salvage

logging in previously approved, carefully designed restoration thinning projects. The SIRs fail to

undertake the significance evaluation for either the effects of the fires or the changed

prescriptions, and fail to take the requisite "hard look" in violation of NEPA requirements. Thus,

the agency cannot rely on the SIRs to shield itself from its NEPA obligations in what was clearly

a situation triggering supplementation. *See Tongass Conservation Soc'y v. Cole*, No. 1:09-cv-

00003 JWS, 2009 U.S. Dist. LEXIS 129952, at *20-21 (D. Alaska Dec. 7, 2009) (Because the

Forest Service failed to take the requisite hard look at the new information and its explanation of

MEMORANDUM IN SUPPORT—30

its decision not to complete a SEIS runs counter to the evidence before the agency, the agency's

decision to not complete a SEIS was arbitrary and capricious).

### III.     Cascadia Will Suffer Irreparable Harm Absent a Preliminary Injunction.

According to the Supreme Court, "[e]nvironmental injury, by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, i.e.,

irreparable." *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545 (1987). Moreover, "[w]hen

a court finds a likelihood of success on the merits of a NEPA claim coupled with likely

environmental harm, the NEPA violation generally is found to rise to the level of irreparable

harm supporting preliminary injunctive relief." *W. Watersheds Project v. Bernhardt,* 391 F.

Supp. 3d 1002, 1022 (D. Or. 2019) (citations omitted); *cf. Citizens for Better Forestry v. U.S.*

*Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003) (noting the "added risk to the environment

that takes place when governmental decisionmakers make up their minds without having before

them an analysis (with public comment) of the likely effects of their decision on the

environment. NEPA's object is to minimize that risk, the risk of uninformed choice.").

Here, Plaintiffs demonstrate a likelihood of irreparable harm because Plaintiffs interests

are in viewing, experiencing, and using the newly burned ecosystems in the Lang Dam and Hwy

46 project areas without the degradation associated with post-fire salvage logging. Krop Decl. ¶¶

12, 21 ("naturally regenerating forest and healthy patchwork of burned and green trees provided

an ideal place to spend many early morning hours spotting deer that hunting season"); Cotton

Decl. ¶¶ 7, 9; Heiken Decl. ¶¶ 9, 10 ("I have a particular affection for burned forests that are just

a new chapter with abundant snags and lots of diverse vegetation used by diverse wildlife.").

Post-fire logging irreparably degrades these interests. Krop Decl. ¶¶ 25-32 ("I would be

irreparably harmed and devastated if these areas are salvaged."); Cotton Decl. ¶¶ 7, 9; Heiken

MEMORANDUM IN SUPPORT—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Decl. ¶¶ 9, 10 ("these [post-fire logging] effects will severely damage my enjoyment of the project area if these stands are logged as planned."). This harm is not just speculative either because post-fire logging has already taken place in these beloved areas. *See, e.g.*, Krop Decl. ¶¶ 24-28 (witnessing the post-fire logging and "the barren, tire-scarred ground, was far more traumatic of an experience than the fire itself."). *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (noting post-fire logging of 1,652 acres and plaintiffs' members harm of inability to "view, experience, and utilize" the area.); *see also Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (recently holding that post-fire roadside logging is irreparable harm).

Moreover, because the Forest Service has conducted no NEPA and provided no opportunity for public involvement, the agency's actions and their impacts evade full environmental review and public scrutiny. *See* Cotton Decl. ¶ 8 ("The inability of Cascadia or its staff to participate, comment, or guide the post-fire logging of areas within the Willamette National Forest is harm to me and our organization and our members which count on us to facilitate and guide this public participation"); Heiken Decl. ¶ 11; Krop Decl. ¶¶ 33-34.

This inability to participate and guide management is made worse by the fact that Cascadia participated extensively in the administrative processes leading up to the original decisions on these projects and reached agreements to forestall litigation that involved the agency dropping commercial logging activities in recently burned areas. Krop Decl. ¶¶ 4-18, Cotton Decl. ¶ 8.

"The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal action occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a

MEMORANDUM IN SUPPORT—32

serious, immediate, and irreparable injury." *Bernhardt*, 391 F. Supp. 3d at 1022 (citations and internal marks omitted). In such instances, "to set aside the agency's action at a later date will not necessarily undo the harm," because the agency and private parties will have committed to the action, and a new NEPA analysis "may bring about a *new* decision, but it is that much less likely to bring about a *different* one." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.). The irreparable harm to Plaintiffs, coupled with the Forest Service's NEPA violation, weigh in favor of an injunction.

###### IV.    The Balance of Equities and Public Interest Tip Sharply in Cascadia's Favor.

When the government is a party, courts consider the balance of equities and the public interest together. *EPIC*, 968 F.3d 991 (citation omitted). If irreparable environmental injury is sufficiently likely, the balance of harms usually will favor the issuance of an injunction to protect the environment. *Id.* (citing *Amoco*, 480 U.S. at 545); *see also W. Org. of Res. Council v. Johanns (in re Geertson Seed Farms)*, 541 F.3d 938, 950 (9th Cir. 2008) ("If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment."). When the government violates federal law, the public interest factor favors the plaintiff. *Bernhardt*, 391 F. Supp. 3d at 1025, 1026 (citing *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). There is a "well-established public interest in preserving nature and avoiding irreparable environmental injury." *Cottrell*, 632 F.3d at 1138.

Further, pursuant to *Cottrell,* the balance of hardships tilted sharply in plaintiffs' favor when they were unable to participate in the administrative appeals process at all and had no opportunity to seek changes in the project before it received final approval by the Forest Service, which is the case here. 632 F.3d at 1137–38; *see* Decl. Cotton. ¶ 8. In fact, Cascadia was only able to bring this case because our staff discovered ongoing post-fire logging. Decl. Cotton. ¶ 10.

MEMORANDUM IN SUPPORT—33

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Again, the balance tips even sharper in Cascadia's favor because our organization had previous agreements pertaining to these projects that forestalled litigation. *See* above; Krop Decl. ¶¶ 4-18.

Although these timber sales have been sold, the Forest Service and the purchasers were forced to renegotiate the contracts given "the catastrophic event" that took place. Ex. H at 97-98. Both parties had every opportunity to revisit or walk away from these contractual commitments. *Id.* Thus, harms to those economic interests, which when viewed through the balance of harms/public interest lens are outweighed by the certain-to-occur environmental harms associated with the project. *See Northern Alaska Envtl. Ctr. v. Hodel*, 803 F. 2d 466, 471 (9th Cir. 1986) ("more than pecuniary harm must be demonstrated" to prevent issuance of injunctive relief); *see also Environmental Protection Information Center v. Blackwell*, 389 F. Supp. 2d 1174, 1221 (N.D. Cal. 2004) (finding that the value of timber to the Forest Service and the economic benefit to surrounding communities are not "unusual circumstances" that warrant denial of an injunction to prevent a timber sale).

To the extent that the Forest Service represents that post-fire logging will have some ecological benefit, they admit this is not the case in the record. Ex. H at 13 ("Don't frame any salvage as ecological beneficial because we don't have a strong leg to stand on at this point.").

Additionally, this is a request for preliminary relief, it would only bar project implementation until this Court reviews the merits of Plaintiffs' claims. Cascadia is willing to expedite this case's consideration to minimize any potential economic cost associated with this temporary delay and has already relayed this to the DOJ. Cady Decl. ¶ 3. Because courts focus on the "portion of the harm that would occur while the preliminary injunction is in place," *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton,* 752 F.3d 755, 765 (9th Cir. 2014), and because the "public interest is served by requiring the Forest Service to

MEMORANDUM IN SUPPORT—34

comply with the law," *EPIC*, 968 F.3d at 992, the balance of equities and public interest tip in Cascadia's favor.

### V.      No Bond Should be Required

Federal Rule of Civil Procedure 65(c) ordinarily requires a movant for a preliminary injunction to provide a bond, but no bond should issue in this case because requiring a bond would have a "chilling effect on litigation to protect the environment to protect the environment and the public interest." *Cascadia Wildlands v. Scott Timber Co.*, 190 F. Supp. 3d 1024, 1036–37 (D. Or. 2016) (quoting *Cent. Or. LandWatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012)); *see also California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985); *see also* Cotton Decl. ¶ 21 (Cascadia Wildland's limited, $11,000 2021 legal budget means the "posting of a non-nominal bond would effectively stop our ability to meaningfully participate in the democratic legal process that allows for public scrutiny of government actions that impact public resources). Courts in this judicial district routinely waive the bond requirement in public interest environmental cases. *See, e.g.*, *Bernhardt*, at 1026 (D. Or. 2019) (waiving bond requirement); *LandWatch*, 905 F. Supp. 2d at 1198 (same).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Cascadia respectfully asks this Court to issue a Preliminary Injunction.

MEMORANDUM IN SUPPORT—35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

DATED this 12th day of October, 2021.


      Respectfully submitted,


          /s/ Nicholas S. Cady
          Nicholas S. Cady (OSB # 113463)
          Cascadia Wildlands
          P.O. Box 10455
          Eugene, Oregon 97440
          Tel: 541-434-1463
          Email: nick@cascwild.org

          Meriel L. Darzen (OSB #113645)
          Crag Law Center
          3141 E. Burnside Street
          Portland, Oregon 97214
          Tel: 503-525-2725
          Email: meriel@crag.org

          *Attorneys for Cascadia Plaintiffs*

MEMORANDUM IN SUPPORT

## TABLE OF EXHIBITS (CADY DECLARATION)

| Ex. | DATE | *Author* / TITLE |
|-----|------|------------------|
| **A** | 10/30/2020 | *U.S. Forest Service*, Burned Area Emergency Response Summary – Holiday Farm Fire" |
| **B** | 10/31/2020 | *U.S. Forest Service*, Burned Area Emergency Response Summary – Lionshead Fire" |
| **C** | March 2018 | *U.S. Forest Service,* Hwy 46 Project EIS |
| **D** | April 2019 | *U.S. Forest Service,* Hwy 46 Project Record of Decision 2nd Decision |
| **E** | 8/23/2017 | *U.S. Forest Service*, Lang Dam Decision Notice and FONSI |
| **F** | 4/6/2021 | *U.S. Forest Service*, Hwy 46 Supplemental Information Report |
| **G** | 6/14/2021 | *U.S. Forest Service*, Lang Dam Supplemental Information Report |
| **H** | 9/9/2021 | *U.S. Forest Service*, Excerpts of Freedom of Information Act Request No. 2021-FS-R6-04164-F |
| **I** | April 2017 | *U.S. Forest Service*, Lang Dam Environmental Assessment |

MEMORANDUM IN SUPPORT