IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


CASCADIA WILDLANDS;                              Civ. No. 6:21-cv-01225-AA
OREGON WILD,

                    Plaintiffs,               **OPINION & ORDER**

        v.

UNITED STATES FOREST
SERVICE,

                    Defendant.
_____

AIKEN, District Judge.

        This case comes before the Court on a Motion for Preliminary Injunction filed

by Plaintiffs Cascadia Wildlands and Oregon Wild.  ECF No. 13.  The Court heard

oral argument on December 2, 2021 by videoconference, ECF No. 27, and GRANTED

the requested injunction.  This Opinion & Order serves to memorialize the Court's

ruling.

**LEGAL STANDARD**

I.      **Preliminary Injunction**

        A preliminary injunction is an "extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary

injunction must show (1) that he or she is likely to succeed on the merits; (2) he or

she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest.  *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  This formulation applies a sliding scale approach where a stronger showing of one element may offset a weaker showing in another element.  *Id.* at 1131.  Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above.  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## II.    NEPA

The National Environmental Policy Act ("NEPA") is a procedural statue that requires the federal government to carefully consider the impacts of and alternatives to major environmental decision.   42 U.S.C. §§ 4321, 4331.  Its purpose "is to ensure that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed."  *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (citation omitted).  "Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making."  *Id.*

# BACKGROUND

The present motion involves two Forest Service projects, the Lang Dam Project and the Hwy 46 Project. Plaintiffs were involved in the administrative and public comment processes for both Projects. Krop Decl., ECF No. 14; Heiken Decl., ECF No. 15; Cotton Decl., ECF No. 19. The Forest Service issued final decisions in both Projects and entered into timber sale contracts prior to the catastrophic wildfires of 2020. After the fire, the contracts were modified to involve salvage logging. In the present motion, Plaintiffs seek to enjoin implementation of the modified contracts in the burned portions of the two Project areas and so some discussion of the original decisions and the effects of the 2020 wildfires is required.

## I.    The Lang Dam Project

In April 2017, the Forest Service issued an Environmental Assessment ("EA") for the Lang Dam Project, which considered proposals for logging in the Willamette National Forest. Cady Decl. Ex. I. ECF No. 18. The Lang Dam Project area encompassed 7,195 acres and the EA assessed harvesting 8.1 million board feet of timber from 20 managed stands. *Id.* at 8. The proposal contemplated 331 acres of commercial thinning with 25 acres retained as skips, as well as 40 acres to be harvested as openings and dominant tree releases ranging from 0.25 to 3 acres in size. *Id.* In total, the Lang Dam Project contemplated commercial timber harvest in approximately 630 acres. *Id.* at 20.

The Lang Dam EA described the Project's purpose and need as: (1) provide a sustainable supply of timber products; (2) actively manage the stands to improve

stand conditions, density, and structure; and (3) manage Riparian Reserves to control stocking and acquire desired vegetation characteristics needed to attain Aquatic Conservation Strategy objectives. Cady Decl. Ex. I, at 11. With respect to the second of these goals, the EA noted that 68% of stands proposed for harvest in the project area are overstocked or showing signs of reduced growth or mortality from competition. *Id.* Overstocked stands caused increased stress on the trees, increasing susceptibility to insect and disease outbreaks. *Id.* Overstocked stands can also "increase the potential for high severity wildfires." *Id.*

In the EA, the Forest Service considered two alternatives: a "no action" alternative, which was rejected as it would not produce a timber harvest; and the proposed action alternative. Cady Decl. Ex. I, at 21-21. On August 23, 2017, the Forest Service issued a Decision Notice/Finding of No Significant Impact ("DN/FONSI") selecting the proposed action alternative for the Lang Dam Project. Cady Decl. Ex. E, at 1. The Forest Service awarded one timber sale contract authorized by the Lang Dam Project. Dasher Decl. ¶ 4. ECF No. 22-2.

## II.    The Hwy 46 Project

In March 2018, the Forest Service issued an Environmental Impact Statement ("EIS") for the Hwy 46 Project, a proposed timber harvest in the Willamette National Forest. Cady Decl. Ex. C. The Hwy 46 Project proposed to treat approximately 4,060 acres. *Id.* at 14. The EIS described the purpose and need of the Hwy 46 Project as (1) improve stand growth, diversity, and structure; (2) move stand structure from an overabundance of mid-seral stands to increase both early and late seral stand

structure within the watershed; (3) reduce hazardous fuels; (4) restore sugar pine and encourage sugar pine regeneration; (5) treat powerline visuals; (6) restore riparian and understory and meadow habitats; (7) restore hydrologic processes in the Short Lake area; and (8) provide a sustainable yield of timber for commercial products to local and regional economies. *Id.* With respect to the first two goals, the EIS noted that the proposed thinning of the forest would improve stand conditions by making more growing space and resources available to the remaining trees. *Id.* In addition, the "cessation of clear-cut logging twenty years ago and continued fire suppression" had resulted in a substantial reduction in early seral habitat in the Project area, which the Forest Service proposed to remedy by thinning the trees in the Project area. *Id.* at 14-15. The Forest Service also noted that the exclusion of fire had resulted in a reduction of meadow habitat and the encroachment of conifers on high elevation meadows. *Id.* at 16.

In the EIS, the Forest Service considered three alternatives for the Hwy 46 Project: a "no action" alternative and two "action" alternatives, which varied by the amount of treatment proposed. Cady Decl. Ex. C at 16. Alternative 2, which involved a larger acreage of timber harvest, was the proposed and preferred alternative. *Id.* at 16-17.

In April 2019, the Forest Service issued a Record of Decision ("ROD") for the Hwy 46 Project. Cady Decl. Ex. D. In the ROD, the Forest Service noted that "Historically, large scale disturbances [in the Project area] have been from infrequent, high intensity fires," but that since the mid-1990s, "there has been

virtually no stand replacing disturbance." *Id.* at 7. The ROD authorized a modified version of Alternative 2, which would allow timber harvest on approximately 2,032 acres and would include "thinning, gap creation, dominant tree release, quality early seral creation, sugar pine restoration, meadow restoration, and skips." *Id.* at 10. The Project was anticipated to yield 23.1 million board feet of timber. *Id.* The ROD also noted that formal consultation with the United States Fish & Wildlife Service ("FWS") was requested pursuant to Section 7 of the Endangered Species Act to consider the effects of the proposed project on the Northern Spotted Owl. *Id.* at 23. The FWS issued a Biological Opinion ("BiOp") in which it concluded that Northern Spotted Owl habitat and critical habitat "will be adversely affected but will not result in disruption or incidental take." *Id.* Of note, the ROD dropped the proposed treatment of units affected by a wildfire in 2017. *Id.* at 20. The Forest Service awarded five timber sale contracts authorized by the Hwy 46 Project decision. Dasher Decl. ¶ 3.

## III.    The 2020 Wildfires

In the autumn of 2020, a series of severe wildfires raged across broad swathes of Oregon. As relevant to this case, these fires included the Holiday Farm Fire and the Lionshead Fire.

The Holiday Farm Fire burned approximately 173,000 acres of land in the McKenzie River watershed, including 39,994 acres of the Willamette National Forest. Cross Decl. ¶ 3. The Holiday Farm Fire burned 340 of 463 acres slated for treatment in the Lang Dam Project area. *Id.* at ¶ 5. The fire resulted in a "mosaic of high,

moderate, and low burn severities across multiple harvest units" in the Lang Dam Project area. *Id.*

The Forest Service assembled a Burned Area Emergency Response ("BAER") team on September 30, 2020 and the team issued its report on the Holiday Farm Fire on October 30, 2020. Cady Decl. Ex. A, at 1. The BAER team reported that, among other damage, the Holiday Farm Fire burned 1,684 acres of critical habitat for the Northern Spotted Owl at high severity and a further 10,740 acres of critical owl habitat at moderate severity. *Id.* at 5.

The Lionshead Fire originated 13 miles east of the Hwy 46 Project area and expanded into the Project area during the historic wind event of September 7, 2020. Rivera Decl. ¶ 3. By October 10, 2020, the Lionshead Fire encompassed 204,469 acres. Cady Decl. Ex. B, at 1. The Lionshead Fire burned 27,397 acres out of 31,295 acres in the Hwy 46 Project area at varying low, moderate, and high intensities. Rivera Decl. ¶ 3. The fire burned 1,609 of 1,845 acres of sold timber. *Id.* The Forest Service assembled a BAER team for the Lionshead Fire on September 28, 2020 and the team issued its report on the fire on October 21, 2020. Cady Decl. Ex. B, at 1. The BAER team reported that, among other damage, the fire had burned 9,056 acres of critical habitat for the Northern Spotted Owl a high level of severity and had burned a further 8,719 acres of owl habitat with moderate severity. *Id.* at 6.

## IV.    Post-Fire Developments

In 2021, the Forest Service prepared Supplemental Information Reports ("SIR") for the Lang Dam Project and the Hwy 46 Project.

The Hwy 46 SIR was issued on April 26, 2021.  Cady Decl. Ex. F.  The SIR concluded that the original purpose and need for treating the Riparian Reserves no longer applied to fire-damaged units.  *Id.* at 2.  The Forest Service concluded that the original prescription for treatment of stands within the Late Successional Reserve would no longer achieve objectives and that the prescription would be changed to salvage logging in the burned areas and green tree harvest would be carried out under the original prescription in the unburned areas.  *Id.*

With respect to the Northern Spotted Owl, the Hwy 46 SIR concluded that the fire has burned some owl territories "to the degree that they are no longer considered viable," and that "[t]erritories that are no longer viable will not be further impaired by harvest activities in those territories."   Cady Decl. Ex. F, at 2-3.  In total, "six historic northern spotted owl home ranges that overlap the project area are no longer considered viable territories," and so "seasonal restrictions are no longer required." *Id.* at 4.  Some territories were dropped from the proposed harvest and, with those changes, the Forest Service concluded that "the project would have no significant effect on northern spotted owls and is consistent with the effects to northern spotted owls disclosed in the Hwy 46 FEIS."  *Id.* at 3-4.

The District Ranger concluded, based on the SIR, that "the new information or changed circumstances do not result in significant impacts from operations beyond the scope and range of effects considered in the original [NEPA] analysis if the [Inter-Disciplinary Team] recommendations, additional design features, and the updated prescriptions are adhered to."  Cady Decl. Ex. F, at 11.  "As such, the Hwy 46 EIS

does not need supplementation, the decisions are still appropriate, and implementation will proceed with the incorporation of the Supplemental Project Design Features." *Id.*

The Lang Dam SIR was issued on June 14, 2021. Cady Decl. Ex. G. The Lang Dam SIR noted that the "Holiday Farm Fire changed circumstances in the planning area that required supplementation of the Lang Dam EA." Cady Decl. Ex. G, at 1. The SIR concluded that the "original purpose and need for the treating Riparian Reserves analyzed under the Lang Dam EA is no longer applicable to the fire affected units," and "commercial thinning would no longer be an appropriate method to attain Aquatic Conservation Strategy Objectives." *Id.* The Forest Service determined that it would drop all riparian areas from treatment and "additional modifications to the prescription were written to be used in combination will [sic] the original prescription." *Id.* at 1-2. The modifications included the "salvage of dead and dying fire damage trees" with thinning retained in areas with green trees. *Id.* at 2. Accordingly, no supplemental NEPA analysis was undertaken for the Lang Dam Project.

The public was not notified of the change to salvage logging from the prescription treatment originally considered in the NEPA processes or that logging in the Project areas would be going forward despite the fires. White Decl. ¶ 2; Krop Decl. ¶ 25. In late April and May 2021, Cascadia Wildlands staff discovered large areas of clearcut forest in the Willamette National Forest and became concerned that illegal logging might be taking place. White Decl. ¶ 2; Cotton Decl. ¶ 10. Cascadia

Wildlands contacted the Forest Service to inquire about the logging and was told that the logging was part of the Lang Dam Project and that other Projects were going forward.  White Decl. ¶ 3.  Plaintiffs filed Freedom of Information Act ("FOIA") requests for documents related to the Forest Service's post-fire logging decisions. Cotton Decl. ¶ 12.  This action followed.

## DISCUSSION

As relevant to the present motion, Plaintiffs allege that the Forest Service violated NEPA by failing to perform supplemental analysis for previously approved projects to account for the effects of the 2020 wildfires.  Plaintiffs seek a preliminary injunction preventing the Forest Service from proceeding with implementation of the Lang Dam Project and the Hwy 46 Project until the Forest Service completes additional environmental review.

## I.    Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's alternative "sliding scale" formulation of the test, serious questions going to the merits of their claims.  *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1131-32. However, a court's decision on a motion for preliminary injunction is not a ruling on the merits of the claim.  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

Under NEPA, agencies have a duty to supplement a final EIS if a major federal action remains to be carried out and "[t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its impacts" or "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(d)(1). However, an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989). Rather, supplemental environmental analysis is necessary "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Id.* at 374 (quoting 42 U.S.C. § 4332(2)(C)). A "rule of reason" applies, which "turns on the value of the new information." *Id.* "Whether new information requires supplemental analysis is a classic example of a factual dispute, the resolution of which implicates substantial agency expertise." *Tri-Valley CAREs v. United States Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (internal quotation marks and citation omitted).

An agency's decision to forego supplemental NEPA analysis should not be set aside unless it was arbitrary or capricious. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000). The Court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks and citation omitted).

"Review under this standard is to be searching and careful, but remains narrow, and the court is not to substitute its judgment for that of the agency." *Id.* This is especially appropriate where the challenged decision "implicates substantial agency expertise." *Id.* The plaintiff will have the burden of showing that there "is not a rational connection between the facts found and the choices made or that there was a clear error in judgment based on the relevant factors." *Friends of Clearwater v. McAllister*, 214 F. Supp.2d 1083, 1087 (D. Mont. 2002) (internal quotation marks and citation omitted). "The agency decision is arbitrary and capricious if the agency has entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

The parties do not seem to dispute that the 2020 wildfires were a "significant new circumstance," not least in that the fires burned significant portions of the Lang Dam and Hwy 46 Project areas. Rather, the Forest Service contends that it appropriately determined that no supplementation was required, as explained in the SIRs it issued for each of the Projects.

Supplemental Information Reports are not mentioned in NEPA or in the regulations implementing NEPA, but courts "have nonetheless recognized a limited role within NEPA's procedural framework for SIRs and other 'non-NEPA' environmental evaluation procedures 'for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS.'" *Friends of Clearwater*, 214 F. Supp.2d at 1087 (quoting *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 565-66 (9th Cir. 2000)). "[O]nce an agency

determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Idaho Sporting Congress*, 222 F.3d at 566.

In this case, it is clear from the SIRs themselves that the wildfires changed the conditions upon which the original EA and EIS were based. For example, the Hwy 46 SIR shows that a substantial percentage of critical habitat for the Northern Spotted Owl in and around the Project area was destroyed and that historical owl habitats had been rendered non-viable. Cady Decl. Ex. F, at 2-4. Nevertheless, the Hwy 46 SIR concludes that, with some changes to unit prescriptions, "the project would have no significant effect on northern spotted owls and is consistent with the effects to northern spotted owls disclosed in the Hwy 46 FEIS." *Id.* at 4. The Court concludes that Plaintiffs have raised serious questions about the connection between the facts found in the SIR and the conclusions reached with respect to the Project impact on the owls.

Similarly, the SIR for the Hwy 46 Project concluded that the effect of the fires on noxious weed populations was "unknown," and post-fire surveys were needed, but that the fires "could greatly increase" the weed population. Cady Decl. Ex. F, at 11. "The weed populations could have increased significantly given the fire treatments and heavy road traffic." *Id.* "Additional weed populations will not hinder timber harvest in these areas; however, the district may need to monitor and treat larger areas of weeds than originally anticipated." *Id.* Likewise, for soils the Forest Service concluded that "[f]ire effects to soils are complex and wide-ranging; as such a full analysis of this topic is beyond the scope of this Supplemental Information Report."

*Id.* at 8.   Nevertheless, the SIR concluded that no NEPA supplementation was needed.  *Id.* at 11.  Whether the SIRs' conclusions on these issues will ultimately be supportable remains to be seen, but the Court concludes that Plaintiffs have raised at least serious questions concerning the connection between the facts found and the ultimate conclusions reached.

Plaintiffs also argue that shift in the planned logging from a general program of thinning to post-fire salvage logging also represents a substantial change to the proposed action that is relevant to environmental concerns and that this change triggers the need for supplementation.  The Ninth Circuit has held that when there are changes to a proposed action, "supplementation is not required when two requirements are satisfied: (1) the new alternative a *minor variation* of one of the alternatives discussed in the draft EIS and (2) the new alternative is *qualitatively within the spectrum of alternatives* that were discussed in the draft EIS."  *Russell Country Sportsmen v. United States Forest Service*, 668 F.3d 1037, 1045 (9th Cir. 2011) (internal quotation marks and citation omitted, alternations normalized, emphasis in original).

As the 2020 fires had yet occurred, a post-fire salvage harvest was obviously not among the alternatives contemplated by the Lang Dam EA or the Hwy 46 EIS.  Nor are the changes in implementation—moving from green tree thinning to salvage clearcutting—the sort of minor variations contemplated by the Ninth Circuit in *Russell Country Sportsmen*.  As the Tenth Circuit has observed: "We would not say that analyzing the likely impacts of building a dirt road along the edge of an

ecosystem excuses an agency from analyzing the impacts of building a four-lane highway straight down the middle, simply because the type of impact—habitat disturbance—is the same under either scenario." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 707 (10th Cir. 2009). Although full consideration of this issue must await further litigation aided by an administrative record, the Court concludes that Plaintiffs have at least shown significant questions going to the merits of this claim.

In sum, the Court concludes Plaintiffs have shown a sufficient likelihood of success on the merits of their NEPA claims, or at least serious questions going to the merits of those claims, such that this factor supports the requested injunction.

## II.     Irreparable Harm

"Ongoing harm to the environment constitutes irreparable harm warranting an injunction. When a project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Environmental Protection Information Center ("EPIC") v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (internal quotation marks and citation omitted). Environmental harm "can seldom be adequately remedied by money damages and is often permanent or of long duration, i.e., irreparable." *Id.* (internal quotation marks and citation omitted). In this case, Plaintiffs have presented evidence that they will suffer irreparable harm in the loss of the fire-damaged portions of the Project areas, which are being more extensively logged than contemplated in the original decisions.

The Forest Service has represented that, although salvage logging has taken place in the Lang Dam Project area, the only further logging planned for the Lang Dam Project is green tree thinning consistent with the original decision and that the thinning harvest is not scheduled to take place until May 2022. Accordingly, the Court will only enjoin the Forest Service from implementing any further salvage logging not contemplated in the Lang Dam EA.

With respect to the Hwy 46 Project, the Forest Service argues that only a small portion of the fire-damaged forest is being logged as part of the Project area and that Plaintiffs have not been irreparably harmed because other fire damaged areas of forest remain accessible. This very argument was specifically rejected by the Ninth Circuit in *Cottrell*, where the Forest Service argued that the Project area represented only six percent of the acreage damaged by the fire and so the plaintiffs could "view, experience and utilize other areas of the forest, including other fire-damaged areas that are not part of the Project" and so would not be harmed by the implementation of the Project. *Cottrell*, 632 F.3d at 1135. The Ninth Circuit noted that such an argument "proves too much" and would lead to the conclusion that "a plaintiff can never suffer environmental injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed." *Id.* The same reasoning applies with equal force in the present case. The Court concludes that Plaintiffs have made an adequate showing of irreparable harm to sustain an injunction in this case.

### III.    Balance of the Equities and the Public Interest

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When the government is a party, these last two factors of the preliminary injunction analysis will merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

In this case, the Government points to the lost revenue and economic value associated with the salvage timber harvest, which may be lost if the injunction is granted. And while such economic losses are certainly to be weighed in the balancing of hardships, the Ninth Circuit has held that "[i]f irreparable environmental injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *EPIC*, 968 F.3d at 991 (internal quotation marks and citations omitted); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005) (affirming a preliminary injunction where the district court engaged in the "classic, and quite proper, examination of the relative hardships" between permanent environmental damage and potential economic loss). Here, the Court has concluded that Plaintiffs have made a sufficient showing of permanent environmental harm in the absence of an injunction and the Court concludes that the balance of the equities weighs in Plaintiffs' favor.

"As to the public interest, Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest." *South Fork Band Council of Western Shoshone of Nev. v. United States Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009). Consistent with that guidance, the Court concludes that the public interest favors an injunction in this case.

## IV.    Bond

Federal Rule of Civil Procedure 65 directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether." *Western Watersheds Project v. Bernhardt*, 391 F. Supp.3d 1002, 1026 (D. Or. 2019). "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Central Oregon Landwatch v. Connaughton*, 905 F. Supp.2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id.* In this case, the Court concludes that no bond should be required.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction, ECF No. 13, is GRANTED.  The Forest Service is enjoined from permitting any further logging in Hwy 46 Project area and any further post-fire salvage logging in the Lang Dam Project area until further order of this Court.

It is so ORDERED and DATED this ____27th____ day of December 2021.

 /s/Ann Aiken_____
ANN AIKEN
United States District Judge